923 A.2d 60

PATTERSON PARK PUBLIC CHARTER SCHOOL, INC., et al.

v.

The BALTIMORE TEACHERS UNION, American Federation of Teachers Local 340, AFL–CIO, et al.

No. 99, Sept. Term, 2006.

Court of Appeals of Maryland.

May 11, 2007.

**176**

Richard C. Daniels (Lani L. Daniels, Daniels & Green, L.L.C., College Park, George A. Nilson, DLA Piper US LLP, on brief), Baltimore, for appellants/cross-appellees.

Sally A. Robinson, Associate Counsel (Tammy L. Turner, Chief Legal Counsel, Frank C. Derr, Associate Counsel, Baltimore City Board of School Commissioners, on brief), Keith J. Zimmerman (Joel A. Smith, Jeffrey M. Ross, Kahn, Smith & Collins, P.A., on brief), Baltimore, for appellees/cross-appellants.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and ALAN M. WILNER, (Retired, specially assigned), JJ.

BATTAGLIA, J.

In 1996, in the wake of a growing national movement toward the development of public charter school programs, the Baltimore City Public School System launched the "New Schools Initiative," a pilot program through which private groups were requested to submit requests-for-proposals to either establish new publicly-funded schools within Baltimore City or to assume control over existing public schools. "Report on the Final Evaluation of the City–State Partnership," Presented to: The New Baltimore City Board of School Commissioners and the Maryland State Department of Education 93 (December 3, 2001). By 2001, five schools were participating in the NSI program. *Id.* at 94. Although these schools were identical in substance and form to public charter schools, because Maryland did not have public charter school enabling legislation, they were not eligible for grant monies from the Federal Charter School Program to aid in their start-up or maintenance costs. Liz Bowie, " 'Go Slow' Policy On Charter Schools City Takes Wary Approach; 18 Groups Weigh Proposals; Sites Can't Open Until Fall 2005," http://www.cityneighbors.org/press/sun05112004.html (originally published in the Baltimore Sun, May 11, 2004).

The Federal Charter School Program was created in 1994 to provide "financial assistance for the planning, program design, and initial implementation of charter schools" for the purpose of increasing "national understanding of the charter schools model" and "evaluating the effects of such schools, including the effects on students, student academic achievement, staff, and parents." 20 U.S.C. § 7221 (2003). The financial assistance is available, however, only to those States having legislation authorizing the creation of public charter schools which provides for the review of each public charter school's performance every five years to ensure that the schools are fulfilling the terms of their charters; holds charter schools to

the same accountability standards as are other public schools; permits entities other than a local board of education to grant charters, or if limited to the local boards, permits an appeals process; and also grants the charter schools autonomy over their budget and expenditures. In support of the Federal Charter School Grant Program, the United States Department of Education undertook a nationwide campaign to present its model public charter school and encourage the States to adopt public charter school enabling legislation.

In 1996, the United States Department of Education delivered a presentation to the Maryland State Board of Education, prompting it to assemble a study group to provide the State Board with guidelines for implementing a qualifying public charter school program in Maryland. After exploring the public charter school legislation of 39 other States, as well as that of the District of Columbia and Puerto Rico, and integrating the State Board guidelines, the General Assembly enacted the *Maryland Public Charter School Act* in 2003. 2003 M d. Laws, Chap. 358.

The Maryland Charter School Act was codified as Title 9 of the Education Article, Section 9–101 of which provides:

(a) *Established.*—There is a Maryland Public Charter School Program.

(b) *Purpose.*—The general purpose of the Program is to establish an alternative means within the existing public school system in order to provide innovative learning opportunities and creative educational approaches to improve the education of students.

Maryland Code (1978, 2004 Repl.Vol.), Section 9–101 of the Education Article.[1] The Act defines a public charter school as "a public school that":

(1) Is nonsectarian in all its programs, policies, and operations;

---

1. Unless otherwise noted, all references to the Maryland Code are to the 2004 Replacement Volume of the Education Article.

(2) Is a school to which parents choose to send their children;

(3) Is open to all students on a space-available basis and admits students on a lottery basis if more students apply than can be accommodated;

(4) Is a new public school or a conversion of an existing public school;

(5) Provides a program of elementary or secondary education or both;

(6) Operates in pursuit of a specific set of educational objectives;

(7) Is tuition-free;

(8) Is subject to federal and State laws prohibiting discrimination;

(9) Is in compliance with all applicable health and safety laws;

(10) Is in compliance with § 9–107 of this title;

(11) Operates under the supervision of the public chartering authority from which its charter is granted and in accordance with its charter and, except as provided in § 9–106 of this title, the provisions of law and regulation governing other public schools;

(12) Requires students to be physically present on school premises for a period of time substantially similar to that which other public school students spend on school premises; and

(13) Is created in accordance with this title and the appropriate county board policy.

Section 9–102.

Section 9–106 (a) and (b) provides that the public charter schools "shall comply with the provisions of law and regulation governing other public schools," and that a waiver of those requirements "may be sought through an appeal to the State Board [of Education]." [2] Section 9–108(a) provides that all

---

2. Section 9–106 provides:

employees of public charter schools "[a]re public school employees," with the right to be collectively represented, and the right to all of the benefits deriving from any existing collective bargaining agreements. Sections 4–103(a) and 6–201 require that the county superintendent shall nominate for appointment all principals, teachers, and clerical personnel of the public school.

In this case, ten Baltimore City public charter schools, including the Patterson Park Public Charter School and The Midtown Academy, Appellants, applied to the State Board of Education for waivers of various State and local educational provisions. All requested waivers pertaining to Section 9–108(a) of the Education Article, stating that public charter school employees are public school employees and granting them the right to be collectively represented, were granted. Appellees, the Baltimore Teachers Union, American Federation of Teachers Local 340, AFL–CIO, and Baltimore Municipal Employees Union, American Federation of State, County and Municipal Employees, Council 67, Local 44 (the "Unions"), the exclusive representative agents of Baltimore City public school employees, and the Baltimore City Board of School Commissioners, petitioned for judicial review of the State Board's decision in the Circuit Court for Baltimore City, from which both Appellants and Appellees subsequently noted an appeal to the Court of Special Appeals. Before any proceed-

(a) *In general.*—Subject to subsection (b) of this section, a public charter school shall comply with the provisions of law and regulation governing other public schools.
(b) *Waiver.*—Subject to subsection (c) of this section, a waiver of the requirements under subsection (a) of this section may be sought through an appeal to the State Board.
(c) *Same—Exceptions.*—A waiver may not be granted from provisions of law or regulation relating to:
(1) Audit requirements;
(2) The measurement of student academic achievement, including all assessments required for other public schools and other assessments mutually agreed upon by the public chartering authority and the school; or
(3) The health, safety, or civil rights of a student or an employee of the charter school.

ings in the intermediate appellate court, this Court, on its own initiative, issued a writ of certiorari.

The first two issues that we are called upon to determine in this case concern some of the provisions for which Section 9–106(b) waivers were sought; specifically, whether under Section 9–106(b), the State Board of Education may waive provisions found in Title 9 of the Education Article, and whether the Board improperly denied Midtown Academy's application for waivers of Sections 4–103(a) and 6–201.

We shall hold that Section 9–106(b) waivers are limited to provisions outside of Title 9 of the Education Article, and that the State Board of Education correctly denied Midtown Academy Academy's request for waivers of Sections 4–103(a) and 6–201.

The next two issues we must determine are procedural and entail whether the Unions had a right to intervene in the waiver application process, and whether the applications were correctly submitted directly to the State Board of Education without first being submitted to and reviewed by the Baltimore City Board of School Commissioners.[3]

---

**3.** In their appeals to the Court of Special Appeals, Patterson Park and Midtown Academy Academy presented three questions for review:

I. Did the trial court err in holding that the state board lacked authority to grant waivers of Educ. § 9–108, [and § 9–105], Md. Code?

II. Did the trial court err in holding that the Unions were necessary parties to any modification of existing collective bargaining agreements?

III. Did the trial court err in determining that the State Board denied the unions due process?

In their cross-appeal, the Unions presented the following questions:

I. Did the State Board violate Educ. §§ 9–108 and 9–106 and exceed its statutory authority by granting waivers from the employee status requirements under Educ. § 9–108?

II. Do the Unions have standing to challenge the orders of the State Board granting the waivers from the employee status requirements under Educ. § 9–108?

The City Board presented the following questions in its cross-appeal:

I. Did the trial court err by holding that the City Board waived its right to contest the State Board of Education's process for deciding

We shall hold that the Unions had a right to intervene in the waiver application proceedings and that the State Board of Education has original jurisdiction over waiver applications submitted pursuant to Section 9–106(b).

## I. Background

Midtown Academy was founded in 1997 under the Baltimore City Public School System's New Schools Initiative program. The school serves the Baltimore City neighborhoods of Bolton Hill and Reservoir Hill and provides education for students in kindergarten through eighth grade. In November of 2004, Midtown Academy applied to convert to a public charter school in order to qualify for federal grant monies, and its application was granted in January of 2005.

The Patterson Park Public Charter School, Inc., serves the Baltimore City neighborhoods of Patterson Park, Patterson Place, Butchers Hill, Fells Prospect, Highlandtown and Canton and provides education for students from kindergarten through eighth grade. Patterson Park applied for its charter in August of 2004, which was granted in November of the same year, with a September, 2005, opening date.

Eight other Baltimore City public charter schools also submitted applications to the State Board of Education in 2005 for waivers of various provisions of both local and State educational requirements. The City Neighbors Public Charter School, Inc. ("City Neighbors") submitted its waiver application on May 18, 2005, which it revised on June 18, 2005, followed by that of Patterson Park and the Southwest Baltimore Charter School's on May 20, 2005; the Crossroads School's on May 23, 2005; Midtown Academy's on May 27, 2005; the KIPP Ujima Village Academy's ("KIPP") on June 1, 2005; the Empower-

requests from charter school applicants for waivers of State law and regulations?

II. Did the trial court err by holding that the State Board was authorized to waive the law governing charter schools?

III. Did the trial court err by affirming the State Board's decision on waiver requests which created new procedures under the guise of deciding waiver requests?

ment Academy's on June 2, 2005; the Inner Harbor East Academy's on June 24, 2005; the Baltimore Curriculum Project, Inc.'s on June 30, 2005; and the Northwood Appold Community Academy's on July 11, 2005.[4] All ten of the

---

4. In addition to requests for waivers of various local rules and regulations, all ten of the schools sought waivers of Sections 9–108(a), 6–401(d), and 6–501(f), which state that all certified and non-certified (employees not holding Maryland certifications) public charter school employees are public school employees and are entitled to the same collective bargaining rights. Sections 4–103(a), 4–311, and 6–501 which provide that employees who are not employed by BCPSS will be employed by the charter school or its operator and are not subject to existing collective bargaining agreements.

All but the Empowerment Academy requested waivers of Sections 4–103(a) and 6–201 which require that the superintendent of the local board of education shall nominate for appointment all principals, teachers, and clerical personnel.

City Neighbors, Patterson Park, Southwest Baltimore, KIPP, Inner Harbor East, and Northwood Appold requested waivers of Section 9–101 which provides that public charter schools be open to all students in Baltimore on a space-available basis, and admit students on a lottery basis if more apply than there are spaces available.

City Neighbors, Patterson Park, Southwest Baltimore, KIPP, The Empowerment Academy, Inner Harbor East, the Baltimore Curriculum Project, and Northwood Appold applied for waivers of Sections 5–112 and 4–310 which require that the public charter schools procure items over a certain amount through competitive bidding processes.

City Neighbors, Southwest Baltimore, Midtown Academy, KIPP, The Empowerment Academy, and the Baltimore Curriculum Project applied for waivers of Section 9–105 which requires that professional staff hold the appropriate Maryland certification.

Patterson Park, Inner Harbor East, and Northwood Appold requested waivers of Section 4–316, which places the staffing and personnel nominations, assignments, promotions, transfers, evaluations, and salaries, as well as temporaries employees and reductions or removals of staff decisions in the hands of the Baltimore City School Board, and Sections 4–111(a)(1), 4–205(h)(i) and 7–106, which places the superintendent of the Baltimore City School Board in charge of the school curriculum and guidelines.

City Neighbors, Patterson Park, Southwest Baltimore, KIPP, Inner Harbor East, the Baltimore Curriculum Project, and Northwood Appold applied for waivers of Sections 7–103(b), 6–408 and 6–510, which sets the opening and closing days, the holidays, and the length of the school days.

Patterson Park and Inner Harbor East applied for waivers of Section 7–101.1 which requires that pre-kindergarten programs be offered.

City Neighbors, Patterson Park, Southwest Baltimore, Inner Harbor East, and Northwood Appold also requested waivers of COMAR

schools' applications requested waivers of Sections 9–108(a) of the Education Article,[5] which provides that all charter school employees are public school employees with the right to be collectively represented and the right to all of the benefits deriving from any existing collective bargaining agreements.

---

13A.06.01.02 and 13A.06.01.05 which require that the Baltimore City Board of Education act as the school food authority.

5. Section 9–108 provides:
 (a) *In general.*—Employees of a public charter school:
 (1) Are public school employees, as defined in § § 6–401(d) and 6–501(f) of this article;
 (2) Are employees of a public school employer, as defined in §§ 6–401(e) and 6–501(g) of this article, in the county in which the public charter school is located; and
 (3) Shall have the rights granted under Title 6, Subtitles 4 and 5 of this article.
 (b) *Collective bargaining agreement.*—If a collective bargaining agreement under Title 6, Subtitle 4 or 5 of this article is already in existence in the county where a public charter school is located, the employee organization and the public charter school may mutually agree to negotiate amendments to the existing agreement to address the needs of the particular public charter school.
 "Public school employee" is defined in two contexts, with regard to those employees that hold Maryland certificates, and those that do not. Thus, "public school employee" is defined as
 a certificated professional individual who is employed by a public school employer or an individual of equivalent status in Baltimore City, except for a county superintendent or an individual designated by the public school employer to act in a negotiating capacity as provided in §§ 6–408(b) of this subtitle.
 Section 6–401 (d)(1). "Public school employee" also is defined as:
 (1) ... [A] noncertificated individual who is employed for at least 9 months a year on a full-time basis by a public school employer.
 (2) "Public school employee" includes a noncertificated employee in Baltimore City notwithstanding that the noncertificated employee does not work for at least 9 months a year on a full-time basis.
 (3) "Public school employee" does not include:
 (i) Management personnel;
 (ii) A confidential employee; or
 (iii) Any individual designated by the public school employer to act in a negotiating capacity as provided in § 6–510(b) of this subtitle. Section 6–501 (f).
 Title 6, Subtitles 4 and 5, grant all public school employees the right to "form, join, and participate in the activities of employee organizations of their own choice for the purpose of being represented on all matters that relate to salaries, wages, hours, and other working conditions." Sections 6–402(a) and 6–503(a).

Each of the schools submitted reasons for requesting the waivers; specifically, Appellant, Patterson Park requested that

all personnel who are not full-time instructional staff be employees of [Patterson Park's] operator, Imagine Schools, Inc. and therefore ... not ... subject to collective bargaining agreements.

This is especially important for the principal of the school. It allows the Operator to hire non-traditional, but highly qualified, candidates. Most importantly, it enables the Operator to hire and supervise the main person who will implement its mission and who will be the mentor for the rest of the professional staff.

In order for [Patterson Park] to be cost effective and innovative in its program and delivery of services, the school must be able to attract and employ administrators, custodial, instructional aides and specialists who are not employees of the school system. [Patterson Park] desires to attract qualified members of the community and parents who would not otherwise be part of the BCPSS system.

Appellant, Midtown Academy, cited the following bases for its Section 9–108(a) waiver request: [6]

While Midtown is prepared to limit its hiring of full-time primary classroom teachers ..., [and] principal or director to ... individual[s] employed by the System, nominated by the [superintendent], and subject to the applicable collective bargaining agreement, it seeks to *maintain* the ability it has enjoyed for 8 years as a New Initiative School to employ individuals as employees of the [nonprofit] operator ("The Midtown Academy Inc."), free of these restrictions.

\* \* \*

Many of the positions for which we seek waiver are either nonexisting in the System ... or rare. We have found it

---

**6.** With regard to its request for waivers of Sections 4–103(a) and 6–201, Midtown Academy set forth the same reasons as it set forth for its requests of Sections 9–108(a), 6–401(d) and 6–501(f), stating "See I above."

far easier to recruit highly qualified individuals in the art, music and language arts areas outside of the System than within it.

The positions Midtown Academy cited for needing the waiver were resource teachers, instructional assistants, a Volunteer Coordinator, and other positions that do not typically exist in the school system, such as a Tae Kwan Do [7] instructor.[8]

On June 20, 2005, Dr. Nancy S. Grasmick, State Superintendent of Schools, wrote to the Baltimore City Public School System ("BCPSS") requesting comments on the waiver applications. The BCPSS responded by stating that it objected to the State Board's review of the waiver applications, which it alleged the State Board had no authority to do under Title 9 of the Education Article. BCPSS asserted that the Baltimore City Board of Education should first be allowed to consider any waiver requests, and if the requests pertain to local rules or regulations, the City Board has the authority to grant or deny the waivers. If, however, the requests pertain to State regulations, and the City Board agrees that the waivers should be granted, BCPSS contended that the City Board could then seek a waiver from the State Board on behalf of the charter school applicant.

The Unions, as the designated exclusive representative for certified and non-certified educational, service, maintenance, food service, and transportation employees of the Baltimore County Public School System, also notified the State Board of Education that they objected to the waiver applications and requested, to no avail, to intervene in the waiver proceedings.[9]

---

**7.** Tae Kwan Do is the "Korean art of unarmed self-defense characterized especially by the extensive use of kicks." Merriam–Webster's Collegiate Dictionary 1272 (11th ed.2005).

**8.** The majority of the other schools also cited the need to staff positions not provided for in the BCPSS model school system, for example, the *Crossroads School* stated that it needed to hire a Director of Instruction, a Dean of Students and Families, and a High School Transition Coordinator.

**9.** The record shows that the Unions wrote to both Valerie V. Cloutier, the Principal Counsel for the State Board of Education, and Dr.

Midtown Academy subsequently filed an opposition to both the BCPSS's objections to the waiver process and the Unions' motions to intervene in the waiver process. Midtown argued that the Unions' interests were sufficiently represented by the BCPSS's involvement and, therefore, their intervention would be superfluous. Midtown Academy further alleged that the BCPSS was estopped from asserting original jurisdiction over the waiver application process because it advised the public charter schools to address all applications to the State Board. Further, Midtown Academy also argued that, because it was not given any notice of the BCPSS's objections to the waiver applications, the objections should be rejected.

On July 22, 2005, in a closed, executive session, and without further communication with either the BCPSS or the Unions, the State Board voted on all but Northwood Appold Community Academy's waiver applications, generally denying all but a limited number of the requests. In its opinions published July 29, 2005, the State Board granted the requested waivers regarding Section 9–102(3), which requires that all charter schools be open to all students on a space-available basis, under the following conditions:

> [The public charter school] shall admit on a priority basis children of founders who are listed on the original charter application and reside in Baltimore City.

And with regard to all ten applications for waivers of Sections 9–108(a), the State Board concluded that:

> [w]ith the exception of positions not currently offered by the Baltimore City Public School System such as that of a karate teacher, all employees of [the public charter school] are public school employees subject to applicable collective bargaining provisions unless modifications are negotiated under Educ. § 9–108(b).

---

Edward L. Root, President of the State Board of Education, objecting to the waiver applications and seeking to intervene in the waiver proceedings.

The State Board issued the same ruling on August 4, 2005, regarding the Northwood Appold Community Academy's requested waiver of Section 9–108(a).

On August 26, 2005, the Unions filed a Petition for Judicial Review of the State Board's rulings in the Circuit Court for Baltimore City pursuant to Section 10–222 of the State Government Article,[10] on the grounds that, although they were entitled under Maryland Rule 7–202(c) [11] to participate in the waiver proceedings, they were not given notice of the administrative hearings concerning the waiver requests, and that, as a result, they were not able to perform their statutory and fiduciary duties to the Baltimore City Public School System employees. In support of their petition, the Unions filed a memorandum alleging that waivers are only permitted with regard to regulations governing *other public schools*, not those pertaining to charter schools, and because the collective bargaining rights found in Section 9–108 pertain specifically to public charter schools, they are not subject to waiver.

---

**10.** Section 10 –222 of the State Government Article provides in pertinent part:

(a) *Review of final decision.*—(1) Except as provided in subsection (b) of this section, a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.

(2) An agency, including an agency that has delegated a contested case to the Office, is entitled to judicial review of a decision as provided in this section if the agency was a party before the agency or the Office.

Maryland Code (1984, 1994 Repl.Vol.), Section 10–222(a) of the State Government Article.

**11.** Maryland Rule 7–202(c) provides:

The petition shall request judicial review, identify the order or action of which review is sought, and state whether the petitioner was a party to the agency proceeding. If the petitioner was not a party, the petition shall state the basis of the petitioner's standing to seek judicial review. No other allegations are necessary. If judicial review of a decision of the Workers' Compensation Commission is sought, the petitioner shall attach to the petition a certificate that copies of the petition were served pursuant to subsection (d)(2) of this Rule.

On August 29, 2006, the Baltimore City Board of School Commissioners (the "City Board") filed ten separate petitions for judicial review in the Circuit Court for Baltimore City, on the grounds that the State's Board improperly exercised original jurisdiction over the applications because Section 9–106(b) provides that the State Board may only consider waiver requests on "appeal," and that the appeal process, governed by COMAR 13A.01.05.01, *et seq.*, envisions appeals to the State Board from waiver decisions first made by a county board of education or the Baltimore City Board of School Commissioners.

Midtown Academy also filed a petition for judicial review of the State Board's denial of several of their requested waivers.[12] In addition to its arguments supporting the State Board's grant of the Section 9–108(a) waivers, Midtown also asserted, among other arguments, that the Board erroneously denied its requested waivers of Sections 4–103(a)[13] and 6–201,[14] provisions which require the Superintendent of the City Board to nominate for appointment all principals, teachers and

---

12. Midtown Academy joined in the petition of KIPP Baltimore, Inc., the charter holder for Midtown Academy, KIPP, City Neighbors, and Southwest Baltimore.

13. Section 4–103(a) provides that:
 On the written recommendation of the county superintendent and subject to the provisions of this article, each county board shall:
 (1) Appoint all principals, teachers, and other certificated and noncertificated personnel; and,
 (2) Set their salaries.

14. Section 6–201 provides in pertinent part:
 (a) *Authority of county board to employ personnel.* The county board shall employ individuals in the positions that the county board considers necessary for the operation of the public schools in the county.
 (b) *Appointment of professional personnel.*—(1) The county superintendent shall nominate for appointment by the county board:
 (i) All professional assistants of the office of county superintendent; and,
 (ii) All principals, teachers, and other certificated personnel.
 (c) *Appointment of clerical nonprofessional personnel.*—(1) Except in Worcester County and Baltimore City, the county superintendent shall appoint clerical and other nonprofessional personnel.

.

clerical personnel of the charter school. Midtown Academy contended that "the power to hire is the lifeblood of any organization," and that the inability to nominate its own staff and personnel inhibited its ability to effectuate its goals and desired results.

Patterson Park filed motions to intervene in both the Unions' and the City Board's actions for judicial review, alleging that the State Board had the authority under both Section 9–106 of the Education Article and COMAR 13A.01.01.02–1 [15] to grant waivers of its regulations and any other law or regulation governing public schools, except with regard to audit requirements, the measurement of student academic achievement, and the health, safety or civil rights of a student or employee. Further, Patterson Park argued that the Unions did not have standing to contest the State Board's decisions because the proceedings applied only to non-Baltimore City public school employees, who are not members of the Unions, and thus the Unions themselves were not affected by the State Board of Education's decisions.

---

**15.** COMAR 13A.01.01.02–1 provides:

A. Authority. Upon a demonstration of good cause, substantial compliance, or comparable effort by an educational institution or program seeking a waiver, the State Board of Education may grant waivers from its regulations.

B. Term.

(1) The term of a waiver may not exceed 3 years.

(2) Requests to renew waivers for additional 3–year terms may be filed with the State Superintendent of Schools.

C. Procedure.

(1) The head of an educational institution or program, including an institution of higher education, or the local superintendent of schools on behalf of a school or school system, shall file a waiver request with the State Superintendent of Schools. The request shall include a description of the desired outcome and an explanation of why the waiver is necessary and justifiable under the circumstances.

(2) The State Superintendent of Schools shall submit to the State Board of Education each waiver request within 45 calendar days of its receipt with a recommendation for either granting or denying the waiver, specifying its term, and providing written justification for any recommended denial.

(3) The State Board of Education shall render a decision at its next regularly scheduled meeting. The decision of the State Board of Education on a waiver request is final.

The Unions also filed a Motion to Consolidate all of the petitions for judicial review of the State Board's public charter school waiver opinions, which the court subsequently granted.

A hearing on the petitions for judicial review was held in the Circuit Court for Baltimore City on January 24, 2006, at which counsel for the Unions, the City Board, the Empowerment Academy, Patterson Park, Midtown Academy, KIPP, City Neighbors, and Southwest Baltimore schools participated in oral arguments and subsequently filed supplemental memoranda more fully discussing the issues heretofore identified. On April 6, 2006, the Court issued a written order reversing the State Board's grant of waivers pertaining to Section 9–108(a). The court determined that the Unions, as necessary parties to the proceedings, were improperly denied their right to intervene because:

> The Baltimore City Public School System and the Unions entered into collective bargaining agreements. The Unions were thus the bargaining agents of said employees, subject to that agreement. These public charter schools are Baltimore City public schools. And, employees of these public charter schools are Baltimore City public employees. The Unions' existing contracts were modified without the Unions' participation in the proceedings.
>
> Section 9–108(b) supports the proposition that the Unions were indispensable parties to the action....
>
> That is, § 9–108 recognizes that where collective bargaining agreements already exist, both the unions and the public charter school(s) must participate in any discussion of change to the contract or collective bargaining agreement. Modifying existing contracts cannot be done without the presence of all parties to the contract—neither in court nor in private negotiations.
>
> In this case, the charter schools sought waivers from the [State Board] to modify existing collective bargaining agreements. In granting those waivers, the [State Board] violated Rule 2–214(a), i.e., the requirement that all public schools recognize negotiated collective bargaining agreements....

> This Court finds that the [State Board] erred as a matter of law in granting waivers of Educ. § 9–108, where the Unions were necessary parties to any modification of existing collective bargaining agreements between them and the BCPSS.

The court also determined that public charter school waivers could be granted for provisions founds in Title 9 because Section 9–106(b), which governs public charter schools waivers, permits waivers of "all provisions of law governing other public schools," and

> the plain language of Educ. § 9–106(a) states that a "public charter school" shall comply with provisions of law governing "other public schools," and that "other public schools" refers to traditional, non-charter, public schools. Regardless of the linguistic gymnastics being used by the parties, Educ. § 9–106(a) clearly states that public charter schools are not governed solely by Title 9 of the Education Article, but are governed by all of the laws traditional public schools are governed by. Public charter schools are public schools.

The court further affirmed all of the State Board's decisions with regard to all other requested waivers, denied the cross-petition of KIPP, Crossroads Academy, Midtown Academy, and Southwest Charter School, and remanded the case to the State Board of Education for further proceedings consistent with its decision.

Patterson Park and Midtown noted timely appeals to the Court of Special Appeals, to which the Unions and the City Board filed cross-appeals. This Court granted a writ of certiorari on its own initiative, *Patterson Park v. Baltimore Teachers,* 396 Md. 11, 912 A.2d 647 (2006), prior to any proceedings in the intermediate appellate court.

Before this Court, Patterson Park argues that Section 9–106(b) of the Education Article requires that waiver applications be submitted to the State Board of Education, not the City Board, because the waiver requests implicated State education law, and thus, could only be granted by the State Board. It further alleges that the trial court erred in holding that the Unions were necessary parties to the waiver process

because the requested waivers would not impact any existing collective bargaining agreements and, as such, the Unions had no standing in the waiver proceedings. For this reason, Patterson Park contends that this case is distinguishable from *Baltimore Teachers Union v. Maryland State Board of Education*, 379 Md. 192, 840 A.2d 728 (2004).

Midtown Academy adopts the arguments of Patterson Park and adds that Section 9–106(c) is the only limitation on the State Board's waiver authority, which by its terms, prohibits waivers of audit requirements, the measurement of student academic achievement, and the health, safety and civil rights of students or employees, and therefore any requested waivers not pertaining to these three categories are subject to waiver. Midtown Academy further alleges that the language of Section 9–106(a), allowing for waivers of all regulations governing "other public schools," necessarily includes public charter schools because they are public schools. Midtown Academy contends therefore, that the State Board should have granted its requested waivers of Sections 4–103(a) and 6–201 because these requests were consistent with the letter and spirit of the Public Charter School Act. It maintains that, to deny these waivers, which would provide it greater autonomy in implementing its alternative educational programs, is to undermine the statutory purpose for the Public Charter Schools Act "to establish alternative means within the existing public school system . . . to improve the education of the students."

The City Board responds that Section 9–106(b) permits the State Board to hear "appeals" of waiver applications which, they argue, clearly grants original jurisdiction over such applications to the local boards of education. It contends that this argument is further supported by COMAR 13A.01.01.01.B, which outlines the appeal process for decisions rendered by local school boards, providing that all appeals are handled by the State Board. The City Board also maintain that Section 9–106(b) does not permit the waiver of all State law requirements which, it asserts, would undermine the very structure creating public charter schools.

The Unions adopt the arguments of the City Board and further posit that all requirements for public charter schools found in Title 9 are not subject to waiver, including the collective bargaining requirements of Section 9–108. The Unions therefore maintain that the State Board's grant of Section 9–108 waivers exceeded its statutory authority and, as such, its actions were ultra vires. The Unions further contend that they have standing to challenge the State Board's decisions under this Court's holding in *Baltimore Teachers Union* because the decisions have the effect of diminishing the size of their bargaining unit.

## II. Analysis

■ This case arises out of the State Board of Education's decisions regarding certain public charter schools' waiver requests. The State Board of Education's authority over the educational system is unique in the annals of administrative agencies. As "[t]he head of the Department [of Education]," it is vested with the power to determine policies and set forth bylaws, rules and regulations for the administration of public schools, as well as interpret both statutory provisions of the Education Article, and its own by-laws, rules, and regulations. Sections 2–101 and 2–205.

We noted in *Board of Education for Dorchester County v. Hubbard,* 305 Md. 774, 506 A.2d 625 (1986), that,

[w]hile administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency's interpretation of a statute which it administers is entitled to weight, the paramount role of the State Board of Education in interpreting the public education law sets it apart from most administrative agencies.

*Id.* at 790–91, 506 A.2d at 633 (footnote omitted).

We recently reviewed the authority of the State Board of Education in *Board of Education of Talbot County v. Heister,* 392 Md. 140, 896 A.2d 342 (2006), stating:

Our cases have long made clear that the State Board has very broad statutory authority over the administration of the public school system in this State.

\* \* \*

In *Wilson v. Board of Educ. of Montgomery County,* we noted that "[t]he totality of these provisions, quite plainly we think, invests the State Board with the last word on any matter concerning educational policy or the administration of the system of public education. This has been described as 'a visitatorial power of the most comprehensive character'." We have had occasion to explain the scope and purpose of this visitatorial power:

> We think it beyond question that the power of visitation vested in the State Board is one of general control and supervision; it authorizes the State Board to superintend the activities of the local boards of education to keep them within the legitimate sphere of their operations, and whenever a controversy or dispute arises involving the educational policy or proper administration of the public school system of the State, the State Board's visit[atorial] power authorizes it to correct all abuses of authority and to nullify all irregular proceedings.

\* \* \*

The State Board's powers are not without limit or their exercise unreviewable.... [T]he State Board may not decide finally purely legal questions, and may not exercise its powers arbitrarily or capriciously. Regarding the first listed limitation, however, we have noted, in the context of decision-making by administrative bodies generally, that "with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency."

*Id.* at 152–155, 896 A.2d at 349–51 (footnote omitted) (citations omitted). *See also Halsey v. Bd. of Educ. of Garrett County,* 273 Md. 566, 572, 331 A.2d 306, 309 (1975) ("[The State Board] cannot be asserted to finally decide purely legal questions.").

■ Thus, the decisions of the State Board of Education are entitled to greater deference than those of most other administrative agencies. *Heister*, 392 Md. at 155, 896 A.2d at 351.

## A. Whether Title 9 Provisions are Subject to Waiver

The Unions and City Board contend that the State Board has contravened the State statute by granting waivers of Section 9–108(a). Both the City Board and the Unions contend that any provision found in Title 9 of the Education Article, which governs public charter schools, cannot be waived because Section 9–106(b) only permits waivers of provisions governing "other public schools."

■ The Circuit Court, however, disagreed with the Unions and the City Board, concluding that "public charter schools are public schools" which "are not governed solely by Title 9 of the Education Article, but are governed by all of the laws traditional public schools are governed by." In short, because Section 9–108(a) provisions are not enumerated among those provisions exempt from waiver in Section 9–106(c), they are subject to waiver. We disagree with the conclusion of the Circuit Court.

■ Whether the provisions of Title 9 of the Education Article are subject to Section 9–106(c) waivers is a question of statutory interpretation. In conducting statutory interpretation, our primary goal is always to "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *Prop. and Cas. Ins. Guar. Corp. v. Yanni*, 397 Md. 474, 919 A.2d 1 (2007) (No. 67, September Term, 2006) (filed March 15, 2007); *In re Kaela C.*, 394 Md. 432, 468, 906 A.2d 915, 936 (2006); *General Motors Corp. v. Seay*, 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.' " *Yanni,*

397 Md. at 481, 919 A.2d at 5; *In re Kaela C.,* 394 Md. at 467, 906 A.2d at 936; *Kane v. Bd. of Appeals of Prince George's County,* 390 Md. 145, 162, 887 A.2d 1060, 1070 (2005); *Giant Food, Inc. v. Dep't of Labor, Licensing and Regulation,* 356 Md. 180, 194, 738 A.2d 856, 860–61, 863 (1999). Further, whenever possible, an interpretation should be given to the statutory provisions which does not lead to absurd consequences. *E.g., Roskelly v. Lamone,* 396 Md. 27, 53, 912 A.2d 658, 673 (2006); *So. Easton Neighborhood Assoc. v. Town of Easton,* 387 Md. 468, 495, 876 A.2d 58, 74 (2005). *See also Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175, 1179 (2003) ( [T]he statute must be given a reasonable interpretation, "not one that is illogical or incompatible with common sense."). If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. *City of Frederick v. Pickett,* 392 Md. 411, 427, 897 A.2d 228, 237 (2006), quoting *Davis v. Slater,* 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004). If however, the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose. *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *Canaj, Inc. v. Baker and Div. Phase III,* 391 Md. 374, 403, 893 A.2d 1067, 1084 (2006); *Comptroller v. Phillips,* 384 Md. 583, 591, 865 A.2d 590, 594 (2005).

Section 9–106 of the Maryland Public Charter School Act provides that:

(a) *In general.*—Subject to subsection (b) of this section, a public charter school shall comply with the provisions of law and regulation governing other public schools.

(b) *Waiver.*—Subject to subsection (c) of this section, a waiver of the requirements under subsection (a) of this section may be sought through an appeal to the State Board.

(c) *Same Exceptions.*—A waiver may not be granted from provisions of law or regulation relating to:

(1) Audit requirements;

(2) The measurement of student academic achievement, including all assessments required for other public schools and other assessments mutually agreed upon by the public chartering authority and the school; or

(3) The health, safety, or civil rights of a student or an employee of the charter school.

The clear implication of this section is that any provision applying to *all* public schools, and not those specific to *just* public charter schools, or those listed in subsection (c), may be waived. Title 9 does not govern *all* public schools, Title 9 governs only public charter schools. Thus, Title 9's provisions are not subject to waiver under Section 9–106(b).

The language of Section 9–102 of the Education Article,[16] "Definitions," further supports this interpretation. Section 9–102 provides that a "public charter school" is a "public school" that "[i]s created in accordance with [Title 9]," "[i]s in compliance with § 9–107 of this title," and "[o]perates . . . in accordance with its charter and, except as provided in § 9–106 of

---

**16.** Section 9–102 defines a public charter schools as "a public school" that:

(1) Is nonsectarian in all its programs, policies, and operations;

(2) Is a school to which parents choose to send their children;

(3) Is open to all students on a space-available basis and admits students on a lottery basis if more students apply than can be accommodated;

(4) Is a new public school or a conversion of an existing public school;

(5) Provides a program of elementary or secondary education or both;

(6) Operates in pursuit of a specific set of educational objectives;

(7) Is tuition-free;

(8) Is subject to federal and State laws prohibiting discrimination;

(9) Is in compliance with all applicable health and safety laws;

(10) Is in compliance with § 9–107 of this title;

(11) Operates under the supervision of the public chartering authority from which its charter is granted and in accordance with its charter and, except as provided in § 9–106 of this title, the provisions of law and regulation governing other public schools;

(12) Requires students to be physically present on school premises for a period of time substantially similar to that which other public school students spend on school premises; and

(13) Is created in accordance with this title and the appropriate county board policy.

this title, the provisions of law and regulation governing *other public schools.*" Section 9–102(10), (11), and (13) (emphasis added).

Thus, Title 9 contains the defining elements of public charter schools, such as nonsectarian, tuition-free, and open to all students on a space-available basis. Section 9–102(1), (3), and (7). Further, public charter schools must be created and operated in accordance with the provisions of Title 9. Section 9–102(13). Section 9–102 does not provide any exception to these requirements; they form the very essence of the public charter school program. By comparison, however, Section 9–102 also requires that public charter schools "[o]perate[ ] . . . in accordance with . . . the provisions of law and regulation governing *other public schools,*" "except as provided in § 9–106 of this title." Section 9–102(11) (emphasis added). Clearly, therefore, when a defining element or requirement of public charter schools was subject to waiver, Section 9–102 so stated.

We, therefore, hold that the provisions of Title 9 of the Education Article are not subject to waiver. To conclude otherwise would lead to the absurd result that all of Title 9's provisions could be waived, rendering the entire Title nugatory, a result which conflicts with the canons of statutory interpretation. *See Reier v. State Dep't of Assessments & Taxation,* 397 Md. 2, 33–34, 915 A.2d 970, 988–89 (2007) (rejecting a specific statutory interpretation because it would lead to an absurd result); *Lamone v. Capozzi,* 396 Md. 53, 89, 912 A.2d 674, 695 (2006) (adopting the Circuit Court's analysis because to hold otherwise would lead to absurd results); *McDermott v. Dougherty,* 385 Md. 320, 326, 869 A.2d 751, 754 (2005) (stating that its holding is based, in part, on the potential for absurd results if the Court were to hold otherwise).

## B. Original Jurisdiction Over Section 9–106(b) Waiver Applications

██ The City Board and the Unions contend that, because the word "appeal" appears in Section 9–106(b), the Baltimore

City Board of School Commissioners has original jurisdiction over all Section 9–106(b) waiver applications; if the application is denied, the City Board's decision may then be "appealed" to the State Board of Education. The City Board argues that this approach is consistent with the provisions of COMAR 13A.01.05.01, *et seq.*, which govern the appeals process from final decisions of a county board of education or the Baltimore City Board of School Commissioners to the State Board.[17]

■■■ Whether the local or State Board of Education has original jurisdiction over waiver applications submitted pursuant to Section 9–106(b) of the Education Article requires us to interpret Sections 9–106 and 9–108(a) of the Education Article. Section 9–106(a) provides that public charter schools "shall comply with the provisions of law and regulation governing other public schools." Public schools are subject to regulations promulgated at both the State and the local level; Sections 2–205 of the Education Article vests the State Board of Education with the power to set forth bylaws, rules and regulations for the administration of public schools, while Sections 4–108(4) and 4–303(d)(1) permit local boards of education to "[a]dopt, codify, and make available to the public bylaws, rules, and regulations not inconsistent with State law, for the conduct and management of the [local] public schools."

Section 9–106(b) provides that "[s]ubject to subsection (c) of this section, a waiver of the requirements under subsection (a) of this section may be sought through an appeal to the State Board." COMAR 13A.01.01.02–1, "Waivers From Regulations," governs waiver applications implicating regulations

---

17. The Circuit Court did not reach this issue because it determined that the City Board gave up its claim of original jurisdiction over the waiver applications when it initially advised the public charter schools to submit their waiver applications to the State Board of Education. We disagree with the Circuit Court as the record demonstrates that the City Board was only acting pursuant to the proposed regulations of the State Board, to which it noted its objections.

The State Board published a proposed draft regulation governing Section 9–106(b) waivers in the Maryland Register on April 29, 2005, but withdrew the regulation on August 19, 2005.

promulgated by the State Board of Education pursuant to Section 2 –205 of the Education Article, and provides in pertinent part:

> The head of an educational institution or program, including an institution of higher education, or the local superintendent of schools on behalf of a school or school system, shall file a waiver request with the State Superintendent of Schools. The request shall include a description of the desired outcome and an explanation of why the waiver is necessary and justifiable under the circumstances.

Although normally the term "appeal" means "[a] proceeding undertaken to have a decision reconsidered by a higher authority," Black's Law Dictionary 105 (8th Ed.2004), Section 9–106, which governs the waiver process, cannot provide for local boards of education to entertain waiver provisions of State laws and regulations, because, as the City Board conceded at oral argument before this Court, local school boards have no authority to waive State laws and regulations, only local regulations. This is because the State Board of Education has primary jurisdiction over all State educational provisions. *See Clinton v. Bd. of Educ. of Howard County,* 315 Md. 666, 675–678, 556 A.2d 273, 277–279 (1989) (holding that the State Board of Education has primary jurisdiction over question regarding the interpretation and application of provisions of the Education Article); *Hubbard,* 305 Md. at 786, 506 A.2d at 630 ("Primary jurisdiction 'is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies.' "), quoting *Md.–Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena,* 282 Md. 588, 601, 386 A.2d 1216, 1225–26 (1978). The legislative history of the Maryland Public Schools Act of 2003 also reflects this tenet.

In 1997, the State Board of Education published its "Guidelines For Use By Local School Systems In Considering Charter School Applications," which recognized that different entities at the federal, State and local level operate to govern public charter schools:

Public charter schools are subject to any federal, state, and local policies, regulations, and statutes that affect traditional elementary and secondary public schools unless the policies, regulations, and statutes are waived by the governing authority. For example, local education authorities may waive certain local policies, procedures, regulations, or practices for any public school under their jurisdiction. The State Board of Education and State Superintendent of Schools may waive certain policies, procedures, or regulations, and they also have some flexibility to waive certain federal regulations under the federal Education Flexibility Act. Waivers from local regulations could be accomplished as part of the negotiated charter, while other waivers may be obtained from the proper authorities in cooperation with the local board.

Guidelines For Use By Local School Systems In Considering Charter School Applications 1, 5 (July 1997). In 1999, A Task Force on Public Charter Schools reported on its findings, which incorporated the suggestion of the State Board's Guidelines, subsequently leading to the genesis two public charter school bills were proposed; House Bill 116, which incorporated the recommendations of the Task Force, and Senate Bill 761, which differed substantially in the treatment of waivers. Senate Bill 761 simply provided that "[A] WAIVER OF HEALTH OR SAFETY REGULATIONS FOR THE PUBLIC CHARTER SCHOOL FACILITY MAY NOT BE GRANTED," whereas House Bill 116 provided in Section 9–108:

*(A) (1) THE STATE BOARD MAY GRANT A WAIVER TO A PUBLIC CHARTER SCHOOL FROM SPECIFIC STATE EDUCATION REGULATIONS AND REQUIREMENTS.*

*(2) THE COUNTY BOARD MAY GRANT A WAIVER TO A PUBLIC CHARTER SCHOOL FROM SPECIFIC LOCAL EDUCATIONAL REGULATIONS AND REQUIREMENTS.*

*(B) A PUBLIC CHARTER SCHOOL MAY BE GRANTED A WAIVER UNDER SUBSECTION (A) OF THIS*

*SECTION IF THE SCHOOL DEMONSTRATES THAT A WAIVER WILL ADVANCE THE EDUCATIONAL GOALS AND OBJECTIVES OF THE SCHOOL.*

*(C) THE STATE BOARD OR A COUNTY BOARD MAY NOT WAIVE A REGULATION OR REQUIREMENT PERTAINING TO THE CIVIL RIGHTS OR THE HEALTH AND SAFETY OF A STUDENT.*

Senate Bill 761, "Educational Opportunity and Family Investment Program Act of 1999," (Regular Session 1999) & House Bill 116, "Education—Public Charter Schools" (Regular Session 1999). Neither bill was enacted.

Subsequently, in 2003, Senate Bill 75, the "Public Charter School Act," was introduced, Section 9–109 of which provided that:

*(A) (1) THE STATE BOARD MAY GRANT A WAIVER TO A PUBLIC CHARTER SCHOOL FROM SPECIFIC STATE EDUCATION REGULATIONS AND REQUIREMENTS.*

*(2) THE COUNTY BOARD MAY GRANT A WAIVER TO A PUBLIC CHARTER SCHOOL FROM SPECIFIC LOCAL EDUCATION REGULATIONS AND REQUIREMENTS.*

*(B) A PUBLIC CHARTER SCHOOL MAY BE GRANTED A WAIVER UNDER SUBSECTION (A) OF THIS SECTION IF THE SCHOOL DEMONSTRATES THAT A WAIVER WILL ADVANCE THE EDUCATIONAL GOALS AND OBJECTIVES OF THE SCHOOL.*

*(C) THE STATE BOARD OR A COUNTY BOARD MAY NOT WAIVE A REGULATION OR REQUIREMENT RELATING TO THE CIVIL RIGHTS OR THE HEALTH AND SAFETY OF A STUDENT.*

Senate Bill 75, "The Public Charter School Act" (Third Reading, Mar. 31, 2003). Between the first and final reading, the waiver provisions were moved to Section 9–106 and amended to provide that "a waiver of the requirements under subsection (a) of this section may be sought through an appeal to the State Board." Section 9–106(b). Prior to the passage of

Senate Bill 75, Delegate John R. Leopold asked the Attorney General to opine on the "appeal" language found in Section 9–106(b), and the Assistant Attorney General Richard E. Israel responded:

> Although [Section 9–106(b) ] refers to taking an appeal to the State Board, there is no reference to a public authority, such as a county board of education, from which an appeal would be taken.

* * *

 It is generally provided that a public charter school is to comply with the provision of laws and regulations which govern other public schools. However, subject to certain exceptions, a waiver of these requirements "may be sought through an appeal to the State Board." You have asked whether the County Board must first rule or whether the State Board considers the matters first.

A review of the legislative history reveals that the provision applying the laws and regulations which govern public schools and which may be waived by an appeal to the State Board was adopted by the Senate on the recommendation of the Senate Education, Health, and Environmental Affairs Committee. The Committee's floor report ... [makes] no reference in the waiver provision to the public authority from which an appeal is taken.

Although Baltimore City and 15 of the 23 counties have home rule, the State has preempted the field of education. Thus, the only law on education is State law and the reference in Senate Bill 75 to a waiver of laws must necessarily mean State law. Under current State law, the State Board of Education and respective county boards of education have the authority to adopt regulations. Thus, the reference in Senate Bill 75 to a waiver of regulations would include State board regulations as well as county board regulations. Although disputes over county board regulations are decided by the County Superintendent of Schools with an appeal to the County Board and then the State Board, it has been understood that disputes concerning

State statutes and State Board regulations of general appli-
cation are matters to be decided by the State Board. A
County Board *would not have a role in deciding* on the
requested waiver.

Letter from Richard E. Israel, Assistant Attorney General, to
John R. Leopold, House Delegate (April 25, 2003) (emphasis
added) (citations omitted). Although we take into consider-
ation the advice of the Assistant Attorney General, we are not
bound by it, nor do we afford it any enhanced weight. *Pub.
Serv. Comm'n of Md. v. Wilson,* 389 Md. 27, 57 n. 18, 882 A.2d
849, 867 n. 18 (2005); *Drew v. First Guar. Mortgage Corp.,*
379 Md. 318, 332, 842 A.2d 1, 9 (2003).

We think it is clear, nevertheless, based upon the dichotomy
of State and local regulators governing public charter schools
today, and having explored the legislative history of the
Maryland Public Charter School Act, that waiver applications
submitted pursuant to Section 9–106(b) implicating State law
or regulations must be submitted directly to the State Board
of Education; the word "appeal" in Section 9–106(b) is, then, a
misnomer. *See Murrell v. Mayor & City Council of Balti-
more,* 376 Md. 170, 185, 829 A.2d 548, 557 (2003), quoting *Kant
v. Montgomery County,* 365 Md. 269, 274, 778 A.2d 384, 387
(2001) (" 'Although § 12–302(a) refers to a circuit court exer-
cising "appellate jurisdiction" in reviewing the decision of an
administrative agency or local legislative body, the word "ap-
pellate" is a misnomer in this context' "). Because this case
implicates waivers of Sections 4–103(a), 6–201, and 9–108(a),
which are State laws, the City Board had no authority to
consider any application.

## C. The Unions' Right to Intervene

The next issue we are called upon to determine is
whether the Unions had standing to challenge the State
Board's waiver decisions. Patterson Park contends that the
Unions were not necessary parties to the waiver process
because the requested waivers did not effect positions covered
by the Baltimore City public school employees' collective
bargaining agreements, only "positions not currently offered

by the Baltimore City Public School System such as that of a karate teacher," as distinguished from the positions effected in *Baltimore Teachers Union v. Maryland State Board of Education*, 379 Md. at 192, 840 A.2d at 728. The Circuit Court held that the Unions were necessary parties to the waiver proceedings because the proceedings modified existing collective bargaining agreements. Although we agree with the Circuit Court that the Unions had standing to intervene, we disagree with its determination that the Unions were necessary parties to the waiver application process because they modified existing collective bargaining agreements; the Unions had standing to intervene because the requested Section 9–108(a) waivers had the *potential* to create a competing labor pool and also to reduce the Unions' collecting bargaining unit.[18]

We had the opportunity to explore standing prerequisites specifically with regard to decisions issued by the State Board of Education in *Baltimore Teachers Union*. In that case, the State Board of Education enacted regulations for the reconstitution of schools that consistently fail to meet the prescribed student performance standards. Part of the reconstitution plan enabled the State Board to delegate control and management over public schools to third parties. Pursuant to these new regulations, the State Board and the Baltimore City Board of School Commissioners entered into a five-year contract with a company, Edison Schools, Inc., under which Edison was to assume operation and management of three Baltimore City public schools, serving as "the employer of all employees hired for the . . . schools" with "the power to hire, assign, discipline, and dismiss all personnel hired at the schools." *Id.* at 197, 840 A.2d at 731. The Baltimore Teachers Union, American Federation of Teachers, Local 340, and the AFL–CIO filed a complaint challenging the reconstitution regulations and the Edison contract to which the State Board

---

**18.** The current collective bargaining agreement was not included in the record, so that we cannot determine whether actual modification would result.

and the City Board responded by filing a motion to dismiss for lack of standing. The circuit court ruled that the Unions had standing, and we affirmed, underscoring that the Unions, as the exclusive collective bargaining agent for the employees of the Baltimore City Public School System, possessed "statutory rights and fiduciary duties to negotiate for, and to act in the best interests of, the public school employees." *Id.* at 199, 840 A.2d at 732. We further explicated that, by removing three public schools from the Unions' charge, the Edison contract not only interjected a competing labor pool with the Unions' bargaining unit, but also reduced the size and scope of the Union's bargaining unit. *Id.* Thus, we held that the Unions had standing to challenge the reconstitution.

In this case, waivers were sought for Section 9–108(a), which provides that employees of public charter schools are public school employees, and are entitled to the benefits of any existing collective bargaining agreements. Pursuant to our jurisprudence in *Baltimore Teachers Union,* the Unions had a statutory and fiduciary duty to represent the Baltimore City public school employees in the waiver proceedings because the waivers created the potential for a competing labor pool within those public charter schools, and also because the waivers had the potential of limiting the scope of the Unions' bargaining unit. Therefore, the Unions possessed a sufficient interest in the proceedings to satisfy standing requirements and the State Board erred by not giving proper notice or opportunity to be heard in the waiver proceedings.

### D. Denial of Midtown Academy's Application for Waivers of Sections 4–103(a) and 6–201

Finally, we address Midtown Academy's contention that the State Board should have granted its requested waivers of Section 4–103(a) and 6–201, which require that the county superintendent nominate for appointment all principals, teachers and clerical personnel for the public charter school. As we stated earlier, the Legislature has vested the State Board of Education " 'with the last word on any matter concerning educational policy or the administration of the

system of public education.' " *Heister,* 392 Md. at 153, 896 A.2d at 350, quoting *Wilson v. Bd. of Educ. of Montgomery County,* 234 Md. 561, 565, 200 A.2d 67, 69 (1964). The State Board's decision was within its authority and was not inconsistent with law. Accordingly, we shall affirm the State Board's denial of those waivers.[19]

For the reasons herein set forth, we shall vacate the judgment of the Circuit Court for Baltimore City and remand this case to that court with instructions to vacate the order of the State Board of Education and remand the case to the State Board of Education for further proceedings consistent with our holding.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO VACATE THE ORDER OF MARYLAND STATE BOARD OF EDUCATION AND REMAND THE CASE TO THE BOARD FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; PATTERSON PARK PUBLIC CHARTER SCHOOL, INC., THE MIDTOWN ACADEMY, INC., AND THE MAYOR AND CITY COUNCIL OF BALTIMORE EACH TO PAY ONE-THIRD OF COSTS.**

---

**19.** We note that the Circuit Court did not set forth its reasoning for affirming the State Board's denial of Midtown Academy's Sections 4–103(a) and 6–201 requested waivers.