943 A.2d 1229

**Jeffrey J. OPERT**

v.

**CRIMINAL INJURIES COMPENSATION BOARD.**

No. 67, Sept. Term, 2007.

Court of Appeals of Maryland.

March 11, 2008.

---

Michael S. Greene (Michael S. Greene, P.A., Owings), on brief, for Petitioner.

Russell P. Butler, Maryland Crime Victims' Resource Center, Inc., Upper Marlboro, for Amicus Curiae.

Steven G. Hildenbrand, Asst. Atty. General (Douglas F. Gansler, Atty. General, Baltimore), on brief, for Respondent.

Argued Before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (Retired, specially assigned), DALE R. CATHELL, (Retired, specially assigned), JJ.

ALAN M. WILNER, Judge, Retired, specially assigned.

The issue before us is whether petitioner, Jeffrey Opert, was the victim of a "crime," as that term is defined in the law relating to the Criminal Injuries Compensation Act (Maryland Code, § 11–801(d) of the Criminal Procedure Article). The Criminal Injuries Compensation Board, the Circuit Court for Baltimore County, and the Court of Special Appeals held that he was not. We disagree with that conclusion and shall direct a remand to the Board for further proceedings.

## BACKGROUND

The Criminal Injuries Compensation law, now codified in §§ 11–801 through 11–819 of the Criminal Procedure Article (CP), was enacted in 1968 for the purpose of enabling innocent victims of certain crimes to receive State-funded compensation for physical injury sustained by them as a result of the crime. *See Criminal Inj. Comp. Bd. v. Remson,* 282 Md. 168, 171, 384 A.2d 58, 61 (1978) and cases cited there. With certain exceptions not relevant here, the law makes a "victim" eligible for an award. A "victim" includes a person who suffers physical injury as a result of a "crime." CP § 11–801(f)(1).

Section 11–801(d)(1) defines the word "crime," in pertinent part, as "a criminal offense under state, federal, or common law" that is committed either in Maryland or against a resident of Maryland in another State. Section 11–801(d)(2), however, provides that "crime" does not include "an act involving the operation of a vessel or motor vehicle" unless "the act" is (i) in violation of § 20–102, § 20–104, § 21–902, or § 21–904 of the Transportation Article,[1] or (ii) operating a motor vehicle or vessel that results in intentional injury.

---

1. Those sections, respectively, require a driver involved in an accident resulting in bodily injury to stop and remain at the scene (§ 20–102) and to provide information and render reasonable assistance to injured persons (§ 20–104), and prohibit a person from driving a motor vehicle while under the influence of or impaired by alcohol or a drug (§ 21–902) and from fleeing or eluding a police officer (§ 21–904).

The relevant facts underlying Mr. Opert's claim are not in substantial dispute and may be taken from the claim form he filed with the Criminal Injuries Compensation Board, from subsequent letters by his attorney to the Board, and from a police report of the incident. In the claim form, Opert stated that, on September 7, 2003, he was riding his motorcycle on I-695—the Baltimore Beltway—when "offender, a pedestrian, crossed said highway causing Claimant to wreck." In a subsequent letter, his attorney added that Opert was riding on the inner loop of the beltway, a controlled access highway, when, without warning, Edward Burgess, a pedestrian, "walked out onto the highway with or on a bicycle." Opert, who was traveling about 40 miles per hour, "was forced to lay down his motorcycle on the roadway to avoid hitting Mr. Burgess," and, as a result, was "launched into the air," fell, and was injured. The police report was consistent with that statement. Burgess was not charged with any offense; nor was Opert.

In support of his contention that he was the victim of a crime, Opert noted that Maryland Code, § 27–101(a) of the Transportation Article (TR) makes the violation of any of the provisions of the motor vehicle laws (not otherwise declared to be a felony) a misdemeanor, and averred that, by his conduct, Burgess committed the following offenses: (1) walking on a controlled access highway, in violation of TR § 21–509, (2) failing to yield the right of way when not crossing in a crosswalk, in violation of TR § 21–503, and (3) having or riding a bicycle on a roadway where the speed limit is 50 miles per hour or more, in violation of TR § 21–1205.1. He did not contend that Burgess had engaged in any intentionally injurious conduct, that he had violated TR § § 20–102, 20–104, 21–902, or 21–904, or that he had committed any other statutory or common law criminal offense.

Opert acknowledged that, under CP § 11–801(d)(2), "crime" does not include an act involving the operation of a motor vehicle, which would include a motorcycle, but he contended that the exception was intended to disqualify only persons "who were victims of acts caused by persons operating a

motor vehicle," *i.e.*, to fall within the exception, it must be the *perpetrator* who was operating a motor vehicle, not the *victim*. The violation of any traffic offense on the part of a pedestrian or bicyclist that causes a person in a motor vehicle to be injured would therefore constitute a crime and render the person eligible for a compensation award.

In November, 2004, the Board informed Opert of its tentative decision to deny the claim and advised him that, if he disagreed with that decision, he could request a hearing before the Board. In its tentative decision, the Board found as fact that Opert had "suffered multiple injuries in a motor vehicle accident in Baltimore County on September 7, 2003" and that he "was riding a motorcycle on I-695 when he swerved to avoid a pedestrian and crashed." The Board announced as a conclusion of law, however, that "the claimant's injuries were not the result of a crime." The Board's tentative order denying the claim was dated November 23, 2004.

Opert promptly informed the Board that he disagreed with the decision and requested a hearing. A hearing was held on April 27, 2005, although, because, with Opert's acquiescence, no transcript was prepared, it is not clear what transpired at that hearing. The parties seem to agree that Opert was the only witness. The Board denied reconsideration of its tentative decision, the Secretary of Public Safety and Correctional Services approved the decision, and Opert filed a petition for judicial review in the Circuit Court for Baltimore County.

In the Circuit Court, Opert made the same argument he presented to the Board—that Burgess committed a crime because what he did was in violation of various traffic laws contained in the Transportation Article, that those violations constitute misdemeanors, and that the exception in CP § 11-801(d)(2) for acts involving a motor vehicle encompasses only conduct by the *perpetrator* that involves a motor vehicle.[2]

---

**2.** In arguing his point, Opert mentioned in passing that Burgess may also have been guilty of reckless endangerment, a suggestion not presented to the Board, but then acknowledged that "I don't know what Mr. Burgess did would be considered reckless endangerment."

Both parties acknowledged that there were no material facts in dispute and that the issue was one of statutory construction. The court concluded that the law was not meant to cover victims of a motor vehicle accident, even if "the perpetrator of the accident may have violated a statute," and it therefore affirmed the Board's decision. In an unreported opinion, the Court of Special Appeals, after reviewing the legislative history of the Criminal Injuries Compensation law, agreed that the General Assembly did not intend for the law to cover motor vehicle accidents, even if caused by the conduct of a pedestrian, and it therefore affirmed the judgment of the Circuit Court.

## DISCUSSION

The issue before us is, indeed, one of statutory construction and therefore one of law. The overarching rule is that, in construing statutes, "our primary goal is always 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision ...'" *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007), citing *Dep't of Health v. Kelly,* 397 Md. 399, 419–20, 918 A.2d 470, 482 (2007), and *Gen. Motors Corp. v. Seay,* 388 Md. 341, 352, 879 A.2d 1049, 1055 (2005). If the language is clear and unambiguous, we ordinarily "need not look beyond the statute's provisions and our analysis ends." *Barbre, supra,* 402 Md. at 173, 935 A.2d at 709.

If, upon this preliminary analysis, however, we conclude that "the language is subject to more than one interpretation, it is ambiguous, and we resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose." *Barbre, supra,* 402 Md. at 173, 935 A.2d at 709; *Patterson Park v. Teachers Union,* 399 Md. 174, 198, 923 A.2d 60, 74 (2007). To the extent relevant, we look as well to "the statute's structure, including the title, and how the statute relates to other laws." *Stouffer v. Pearson,* 390 Md. 36, 46, 887 A.2d 623, 629 (2005). In a judicial review action in which an administrative agency's interpretation of the statute

it is charged with implementing is challenged, it is ultimately for the court to determine whether the agency's interpretation is legally correct, but, in making that determination, the court generally gives considerable weight to the agency's view. *Montgomery County v. Glenmont Hills,* 402 Md. 250, 271, 936 A.2d 325, 337 (2007); *John A. v. Bd. of Education,* 400 Md. 363, 382, 929 A.2d 136, 147 (2007). Finally, to the extent possible, remedial statutes "are to be liberally construed to 'suppress the evil and advance the remedy.'" *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Triggs v. State,* 382 Md. 27, 45, 852 A.2d 114, 125 (2004). *See also Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 494, 331 A.2d 55, 61 (1975).

In accordance with those principles, we turn first to the language of the statute—CP § 11–801(d). As noted, subsection (d)(1) defines "crime" as including a criminal offense under State, Federal, or common law committed in Maryland or in another State against a Maryland resident, "except as provided" in subsection (d)(2). Subsection (d)(2) provides that " '[c]rime' does not include an act involving the operation of a vessel or motor vehicle unless the act is: (i) a violation of [one of the four enumerated Transportation Article offenses] or (ii) operating a motor vehicle or vessel that results in an intentional injury."

The particular language at issue here is "an act involving the operation of a . . . motor vehicle." Opert contends that the phrase refers only to the operation of a motor vehicle by the "perpetrator"—by the person who commits the offense. The language says that a *crime* does not include an *act* involving the operation of a motor vehicle. A *crime* is necessarily committed by the perpetrator—the actor—so if there is to be an exclusion, it must be in the context of the operation of the motor vehicle by the actor, not the passive victim. The specific exceptions that follow—operating a motor vehicle in a way that results in intentional injuries and the particular offenses listed—all presume operation of the motor vehicle by the actor. The Board, with equal vigor, notes that the statute doesn't make that distinction but instead speaks of an act

"involving the operation" of a motor vehicle. It urges that the exclusion applies whenever the injury arises from the operation of a motor vehicle, no matter who is operating it.

Without any further context, the language could reasonably be read either way, and, for that reason, it is ambiguous. We therefore need to look at other relevant indicators of what the Legislature intended, beginning with the legislative history.

The Criminal Injuries Compensation law was enacted in 1968 and was initially codified in Art. 26A of the 1957 Code. *See* 1968 Md. Laws, ch. 455. As now, it made a "victim" eligible for benefits, and it defined "victim" as "a person who suffers personal physical injury or death as a direct result of a crime." The term "crime" was defined, in § 2(c) of Art. 26A, as follows:

> " 'Crime' shall mean an act committed by any person in the State of Maryland which would constitute a crime as defined in Article 27 of the Annotated Code of Maryland (1967 Replacement Volume) or at common law, provided, however, that no act involving the operation of a motor vehicle which results in injury shall constitute a crime for the purpose of this article unless the injuries were intentionally inflicted through the use of a vehicle."

A number of things are significant about this initial enactment. Although the basic criminal code was then set forth in Art. 27 of the Code, that article was not the embodiment of all of the statutory crimes in Maryland. There were many crimes created in other articles of the Code. The motor vehicle laws, and with them the various traffic offenses, were in Article 66½ of the Code. By limiting the definition of "crime" to crimes defined in Art. 27 or common law crimes, the Legislature obviously intended to exclude all of those other statutory crimes, including the motor vehicle offenses contained in Article 66½. On the other hand, there were then (as there are now in the Criminal Law Article), a number of offenses in Article 27 in which the operation of a motor vehicle

could be involved,[3] so the specific exception for non-intentional acts involving the operation of a motor vehicle had meaning and was not mere surplusage. It served to exclude from the program crimes that, because of their placement in Art. 27, would otherwise be included.

In addition, by confining the definition to crimes in Art. 27 or common law crimes, the Legislature excluded injuries resulting from conduct that constituted only a Federal crime, and by requiring that the crime be committed in Maryland, it excluded injuries suffered by Maryland citizens from crimes committed in other States. Another significant limitation was imposed by § 5(b) of Art. 26A, which made a member of the family of the person criminally responsible for the crime upon which the claim was based ineligible for an award and thus effectively precluded an award to most victims of domestic violence.

The scope of the law was, and is, clearly circumscribed by the definition of "crime." Section 12(a) of Art. 26A (and current CP § 11–810), which established conditions on awards, provided that the Board could make an award only if it found that a crime (or now a delinquent act) was committed. That scope, in the initial enactment, was deliberately narrow. As we pointed out in *Criminal Inj. Comp. Bd. v. Gould, supra,* 273 Md. at 495–96, 331 A.2d at 62, Maryland was only the fifth State in the country to adopt such a law. A version of the law, apparently modeled on a 1966 New York law, had been presented to the General Assembly in 1967 and had died in the House Judiciary Committee. *See* Sen. Bill 9 (1967) and 1 *Report to General Assembly of 1968,* Legislative Council of Maryland, at 287. We observed in *Gould, supra,* 273 Md. at 496–97, n. 6, 331 A.2d at 62, n. 6, quoting from H. Edelhertz and G. Geis, *Public Compensation to Victims of Crime,* at 176 (1974):

---

3. *See,* for example, Maryland Code (1957, 1967 Repl.Vol.) Art. 27, § 206 (refusal to return rented motor vehicle), § 348 (larceny of motor vehicle), § 349 (unauthorized use of motor vehicle), § 388 (manslaughter by motor vehicle), § 555 (refusal to pay taxicab fare), and § 574 (use of automobile to transport person for lewd or immoral purpose).

"Governor Mandel is quoted as stating at the time the Legislative Council measure was proposed to the General Assembly in 1966 that the Bill 'was viewed at the time with great skepticism' and that the 'legislators felt that they would be venturing into an uncharted area where we didn't have any guidelines to go by.' They were also concerned about the possible costs, with estimates ranging from $1 million to $10 million per year."

The restrictive definition of "crime" in the 1968 law remained intact until 1983, when the Legislature narrowed it further by excluding acts involving the operation of a vessel. A major, and, in our view, determinative, expansion of the definition, and thus the scope of the law, came in 1985, in response to the Federal Victims of Crime Assistance Act of 1984 (VOCA) (P.L. 98–473, 42 U.S.C. § 10601 *et seq.*). Some background is important.

Funds for the payment of awards under the Maryland program initially came from the assessment of a special $5 court cost on defendants convicted of criminal offenses other than motor vehicle or vessel violations. *See* former Art. 26A, § 17. As noted, however, there was concern whether collections of those costs would suffice to meet the need.[4] VOCA created a permanent Federal Crime Victims Fund from which the U.S. Attorney General could make grants to State-operated victim compensation programs that met certain conditions. Among those conditions were that (1) the program provide compensation to victims of Federal crimes occurring within the State on the same basis that compensation was available to victims of State crimes, and (2) the State provide compensation for mental health counseling and funeral expenses. *See* §§ 1402 and 1403 of P.L. 98–473 (42 U.S.C. §§ 10601 and

---

**4.** In its second Report to the Governor and General Assembly, for FY 1971, the Board stated that, in FY 1970, $135,438 had been collected from the court costs, but awards totaling $328,000 had been made. For FY 1971, it was estimated that $150,000 would be collected and that awards totaling over $614,000 would be made. *See Second Annual Report*, Criminal Injuries Compensation Board, at 11.

10602); also S.Rep. No. 98–497, accompanying P.L. 98–473, at 9, reprinted in 1984 U.S.C.C.A.N 3182, 3615.[5]

Because the definition of "crime" in § 2(c) of Art. 26A included only crimes defined in Article 27 or common law crimes, the Maryland law did not then provide compensation to victims of any Federal crime, nor did it provide benefits for mental health counseling or funeral expenses. In order for the Maryland program to be eligible for the Federal funds, therefore, it was necessary to amend the law in those respects. Partly to that end, Sen. Bill 639 was introduced into the 1985 Session as an Administration Bill. In its initial form, the bill seemed to have three major substantive objectives: (1) to broaden the definition of "crime" to include Federal crimes, (2) to permit the Board, in its discretion, to allow claims for injuries sustained through domestic violence by waiving the

---

5. The requirement that compensation be provided on an equivalent basis to victims of Federal crimes was peculiarly worded. The condition was that the State program "provides compensation to victims of crimes occurring within such State that would be compensable crimes, but for the fact that such crimes are subject to Federal jurisdiction, on the same basis that such program provides compensation to victims of compensable crimes." *See* P.L. 98–473, § 1403(b)(5), 42 U.S.C. § 10602(b)(5) (1984). That language, read literally, suggests that not *all* Federal crimes had to be included but only those that would be compensable crimes under the State program but for the fact that there was Federal jurisdiction. The Senate Report accompanying the bill indicates a broader intent, however. It construed the provision as a requirement that the State program "provides the same benefits to victims of Federal crime as to victims of State crime." *See* Sen. Rep. 98–497 at 9, reprinted in 1984 U.S.C.C.A.N. 3182, 3615. That broader intent was made manifest four years later, when the 1984 language was deleted in favor of the requirement that "such program provides compensation to victims of Federal crimes occurring within the State on the same basis that such program provides compensation to victims of State crimes." *See* P.L. 100–690, § 7125(d), amending 42 U.S.C. § 10602(b)(5). In explaining the 1988 amendment, which was part of the comprehensive Anti–Drug Abuse Act of 1988, the Chairman of the Senate Judiciary Committee stated that the new language was merely clarifying in nature—that it "merely clarifies that a program compensate victims of federal crime occurring within the State on the same basis as victims of State crimes." *See Section Analysis of Judiciary Committee Issues in H.R. 5210*, 134 Cong. Rec. S17360–02, Nov. 18, 1988.

disqualification for family members of the perpetrator under certain conditions, and (3) to permit an award for psychological injury. The first two objectives were approved; the third was not, although the bill, as enacted, allowed an award for mental health counseling and funeral expenses, as required by VOCA.

The first objective, of permitting an award for injuries sustained as the result of a Federal crime, from a drafting perspective, was an easy one to achieve. All that the Legislature needed to do was add the words "under Federal law" to the existing definition. That would have retained the limited universe of State crimes to those stated in Article 27 and common law crimes. For whatever reason, however, the General Assembly did not choose that narrow approach. Instead, it amended the definition to include "an act committed by any person in this State which would be a crime under the laws of this State, Federal law, or at common law." *See* 1985 Md. Laws, ch. 120. By substituting "under the laws of this State" for "as defined in Article 27," the General Assembly, subject to the proviso for acts involving the operation of a motor vehicle, swept into the program *all* statutory crimes, wherever located in the Maryland Code, including Art. 66 ½.[6]

---

**6.** We need not speculate whether the General Assembly fully understood the import of the language change with respect to State statutory crimes. Much of the attention appeared to be on the provisions dealing with domestic violence, psychological injury, and mental health counseling. The title to the bill stated one purpose of the bill as "providing that certain individuals who are victims of a federal crime committed in this State may receive compensation under the Criminal Injuries Compensation Act under certain conditions" and as additional purposes clarification that compensation may be awarded for funeral expenses and mental health counseling and that the Board may waive the ineligibility of certain family members under certain conditions. It included as well the catchall of "generally relating to the Criminal Injuries Compensation Act," but omitted to refer specifically to the expansion of the law to State statutory crimes outside of Art. 27. *See* 1985 Md. Laws, ch. 120. Neither party has suggested any infirmity in the Act under Art. III, § 29 of the Maryland Constitution by reason of that omission, so that issue is not before us. As we shall observe, the 1985 language was reenacted by the Legislature on at least five subsequent occasions.

The effect of that expansion was to make the exclusion of crimes involving the operation of motor vehicles (and vessels) dependent entirely on the scope of the proviso that "no act involving the operation of a vessel or motor vehicle which results in injury shall constitute a crime for the purpose of this article unless the injuries were intentionally inflicted through the use of a vessel or motor vehicle." As noted, when the universe of statutory crimes was limited to those in Art. 27, the only effect of the proviso was to further limit that universe by excluding Art. 27 crimes that involved the operation of a motor vehicle, but that changed radically when the universe was expanded to include all statutory crimes, including those in Art. 66½. Whether a crime in which a motor vehicle was involved was to be thereafter excluded depended entirely on how the unamended proviso was to be construed.

The Legislature had several opportunities to revisit the issue, but declined to do so. In 1988, Congress amended 42 U.S.C. § 10602(b) to require, among other things, that the State program offer compensation to victims of drunk driving and domestic violence and to residents of the State who are victims of crimes occurring outside the State if the crimes would be compensable crimes had they occurred in the home State and the foreign State did not have its own compensation program. As noted, Congress also clarified that the program had to provide compensation to victims of any Federal crime occurring in the State on the same basis as it provided compensation to victims of State crime. *See* P.L. 100–690. States were given until 1990, later extended to 1991, to conform their programs.

In 1991, the Legislature enacted conforming legislation which, with some limitations, included those provisions. *See* 1991 Md. Laws, ch. 656. To comply with the Federal mandate, it repealed the existing definition of "crime" and rewrote § 2(c) to read as follows:

"(1) Except as provided in paragraph (2) of this subsection, 'crime' means an act:

(i) committed by any person in this State which is a criminal offense under State, federal, or common law;

(ii) committed in another state against a resident of this State which is a criminal offense under State, federal, or common law'

(iii) of operating a motor vehicle in violation of § 21-902(a), (b), (c), or (d) of the Transportation article; or

(iv) of operating a motor vehicle or vessel which results in injury which was intentionally inflicted.

(2) Except as provided in paragraph (1)(iii) and (iv) of this subsection, 'crime' does not include an act involving the operation of a vessel or motor vehicle."

Thus was the broad inclusion of State crime re-enacted, and, indeed, expanded to include injuries resulting from the operation of a motor vehicle in violation of the drunk driving law. The Bill Analysis prepared by the Department of Legislative Services made the point that "[c]urrently, a person may not recover under the Criminal Injuries Compensation Act for injury or death *caused* by an automobile unless the automobile *is used* intentionally to cause the injury or death." (Emphasis added). That is repeated in the Floor Report of the Senate Judicial Proceedings Committee.

In 1997, the definition of "crime" was amended to add a delinquent act committed by a juvenile and an act of international terrorism committed against a Maryland resident outside the United States. *See* 1997 Md. Laws, chs. 311, 312, and 46. In all three bills, the broad language "under State, federal, or common law" was re-enacted. Finally, in 2001, the Legislature added three more motor vehicle violations to the definition—those dealing with failing to stop and render assistance at an accident resulting in bodily injury and fleeing or eluding a police officer—and, in a general code revision bill, then transferred the entire statute to the Criminal Procedure Article. *See* 2001 Md. Laws, chs. 483 and 10.

The proviso thus remains an exception to an otherwise all-encompassing definition. For four reasons, we are persuaded that Opert's view is more reflective of the likely legislative

intent. The first is the gratuitous expansion of the universe of State crimes in 1985, which, as noted, was wholly unnecessary merely to conform the law to the new VOCA requirement and which put a very different gloss on the proviso. The second is the language of the proviso itself. The Board's construction would have a more solid foundation if the exclusion were framed in terms of *injuries* arising from the operation of a motor vehicle, rather than "an act" involving the operation of such a vehicle. We are more inclined to Opert's view that, by hinging the exclusion on the "act," the focus is necessarily on the manner in which the perpetrator operated a motor vehicle, rather than on the mere involvement of a vehicle in the infliction of injury. That view is supported by the fact that all of the exceptions to the exclusion are plainly in the context of the operation of a motor vehicle by the perpetrator.

Third, it is clear from the statement of legislative policy in CP § 11–802 that the law is remedial in nature, and remedial statutes are to be liberally construed. The Legislature has recognized and articulated that "there is a need for government financial assistance for these victims" and that "[t]he policy of the State is that help, care, and support be provided by the State, as a matter of moral responsibility, for these victims." CP § 11–802. That objective, that policy, is advanced by construing ambiguous language in favor of eligibility.

Finally, it is noteworthy that, in a closely allied statute, the Legislature has demonstrated that, when it wishes to broadly and unambiguously exclude all routine traffic offenses from the definition of "crime" for purposes of the criminal injuries compensation program, it knows well how to do so.

In 1993, the Legislature restructured the financing of the criminal injuries compensation program. Previously, part of the special court costs imposed on criminal convictions and collected by the Comptroller were deposited in the general funds of the State and then appropriated by the Legislature to the Criminal Injuries Compensation Board. By 1993 Md. Laws, ch. 224, the Legislature created a non-lapsing Criminal

Injuries Compensation Fund, which would receive part of the special court costs and, from them, fund both the administrative costs of the program and awards made under it. Those court costs, as noted, were imposed on defendants convicted of a "crime," and, for that purpose, former Art. 26A, § 17 defined "crime" as crimes under Art. 27, common law crimes, and those violations of the Transportation Article which were punishable by imprisonment. The law thus excluded from the definition all other crimes under the Transportation Article. That, in itself, is significant. In the very same article, Art. 26A, devoted entirely to the criminal injuries compensation program, the Legislature had defined the same term, "crime," in two different ways, in the one case, with respect to the special court costs that funded the program, making clear that all non-incarcerable Transportation Act violations were excluded. It did not impart that same clarity to § 2(c).

The contrast became even greater two years later. In 1995, the Legislature decided to enlarge the pot by imposing a special court cost on convictions of non-incarcerable violations under the Transportation Article—the class of violations addressed by the proviso in what was then Art. 26A, § 2(c) and now in CP, § 11–801(d)(2)—but it did so by defining those violations as "offenses," rather than "crimes" and imposing the new cost on those "offenses." *See* 1995 Md. Laws, ch. 396.[7] With the enactment of the Criminal Procedure Article in 2001, those provisions were moved to § 7–409 of the Cts. & Jud. Proc. Article.

For all of these reasons, we do not believe that the proviso in CP § 11–801(d)(2) applies to the conduct allegedly engaged in by Mr. Burgess, and that his conduct may constitute a "crime" under § 11–801(d)(1). It appears that the Board's decision was based on its erroneous belief that the proviso *did* apply to that conduct, and, for that reason, no crime was committed. The case will therefore have to be remanded to

---

7. At the time, the special court cost imposed on criminal convictions in Circuit Court was $40; in District Court, it was $30. The court cost imposed for an "offense" was set at $3.

the Board for further proceedings, including a determination whether Burgess's conduct sufficed to constitute a violation of any of the offenses asserted by Opert.[8]

JUDGMENT OF COURT OF SPECIAL APPEALS RE-VERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIR-CUIT COURT FOR BALTIMORE COUNTY AND RE-MAND TO THAT COURT WITH INSTRUCTIONS TO REVERSE DECISION OF CRIMINAL INJURIES COM-PENSATION BOARD AND REMAND TO THAT BOARD FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

Dissenting Opinion by BATTAGLIA, Judge, which GREENE and CATHELL, Judges, join.

I respectfully dissent.

In the present case, the Criminal Injuries Compensation Board determined that alleged violations of Transportation Law Article, Section 21–509(b) (walking on a controlled access highway), 21–503(a) (failing to yield the right of way when not

---

8. We recognize that this is an unusual case, apparently one of first impression and perhaps one that previously escaped legislative focus. One does not often see pedestrians or bicyclists on high-speed limited access highways. The law, as presently worded, however, may well allow recovery any time a motorist suffers some injury as the result of swerving, stopping suddenly, slowing down, or speeding up to avoid a pedestrian or a bicyclist who is violating some traffic law on any urban, suburban, or rural street. See TR §§ 21–501 through 21–511, regulating the conduct of pedestrians, and TR §§ 21–1201 through 21–1212, regulating the conduct of bicyclists (and their parents). It is for the Legislature to clarify the law in that regard. We note that most States exclude from their criminal injury compensation program injuries resulting from routine traffic violations, but they do so in different ways. Some States have decriminalized those violations and regard them as civil infractions; others have limited the scope of the program by enumerating specifically the included crimes, thereby excluding all others; a third group have a categorical exclusion of motor vehicle violations but the articulation of that exclusion is by no means uniform. Because this appears to be a case of first impression, we discern no long-standing or consistent practice by the Criminal Injuries Compensation Board to which particular deference would be due.

crossing in a crosswalk), or 21–1205.1(a)(1) (having or riding a bicycle on a roadway where the speed limit is 50 miles per hour or more) by a pedestrian, rather than a motorist, who was not charged, do not come within the meaning of "crime" in the Criminal Injuries Compensation Act, entitling the Petitioner to compensation from the Board:

> The claimant is a 24–year–old male who suffered multiple injuries in a motor vehicle accident in Baltimore County on September 7, 2003. The claimant was riding a motorcycle on I695 when he swerved to avoid a pedestrian and crashed. The pedestrian, who is listed on the incident report as a witness, was not cited for any offense.

> \* \* \*

> The Board concludes after reviewing the file, the evidence submitted, and after due deliberation that the claimant's injuries were not the result of a crime.

The Circuit Court for Baltimore County, as well as the Court of Special Appeals, in an unreported opinion, agreed, while the majority herein disagrees.

Section 11–808(a)(1)(i) of the Criminal Injuries Compensation Act states that, with certain exceptions not relevant here, a victim is eligible to receive an award from the Criminal Injuries Compensation Board. A victim, as defined by the Act, includes an individual "who suffers physical injury or death as a result of a crime." Maryland Code (2001), Section 11–801(f) of the Criminal Procedure Article. "Crime" is defined as:

(d) *Crime.*—(1) "Crime" means:

(i) except as provided in paragraph (2) of this subsection, a criminal offense under state, federal, or common law that is committed in:

1. this State; or

another state against a resident of this State; or

(ii) an act of international terrorism as defined in Title 18, § 2331 of the United States Code that is committed outside of the United States against a resident of this State.

(2) "Crime" does not include an act involving the operation of a vessel or motor vehicle unless the act is:

(i) a violation of § 20–102, § 20–104, § 21–902, or § 21–904 of the Transportation Article; or

(ii) operating a motor vehicle or vessel that results in an intentional injury.

*Id.* at Section 11–801(d).

The gravamen of the instant case is the exclusion from the definition of "crime" in subsection (d)(2) providing that " '[c]rime' does not include an act involving the operation of a ... motor vehicle." Clearly, the import of this statutory language is that, with certain exceptions not applicable here, an individual may not recover from the Criminal Injuries Compensation Board for injuries resulting from an act involving the operation of a motor vehicle. The majority, however, concludes that the phrase "involving the operation of a ... motor vehicle" is ambiguous and interprets the statute to include the acts of a pedestrian as criminal, even though the injured person was driving a motor vehicle.

This is an error. Because we interpret statutory language according to its plain, natural and ordinary meaning, *see Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007); *Patterson Park Public Charter School, Inc. v. Baltimore Teachers Union*, 399 Md. 174, 197, 923 A.2d 60, 74 (2007); *City of Frederick v. Pickett*, 392 Md. 411, 427, 897 A.2d 228, 237 (2006), "an act involving the operation of a ... motor vehicle" in (d)(2) does not mean only an act of an operator of a motor vehicle, as revealed in the ordinary meaning of "involve," connoting inclusion of an essential feature. *See* Merriam–Webster's Collegiate Dictionary 660 (11th ed.2005) (defining "involve" as "to relate closely" and "to require as a necessary accompaniment"); Webster's II New College Dictionary 584 (1999) (defining "involve" as to "include or contain as a part" and to "have as an essential feature or consequence"); The Random House Dictionary of the English Language 1005 (2nd ed.1987) (defining "involve" as "to include as a necessary circumstance, condition, or consequence" and "to

include, contain, or comprehend within itself or its scope"). In the instant case, clearly, the accident from which Opert seeks recovery for his injuries involved his operation of a motor vehicle. Therefore, the acts of the pedestrian and Opert involved the operation of a motor vehicle and Opert is not entitled to compensation under the Criminal Injuries Compensation Act.

What the majority does is supplant the language "an act involving the operation of a ... motor vehicle" with "an act committed by an operator of a ... motor vehicle." If the General Assembly intended to restrict the definition of "crime" by excluding only those acts committed by the operator of a motor vehicle, it would have done so with a direct and explicit reference to such an distinction. Contrary to the majority's view, the statute does not focus on the operator of a motor vehicle, but instead, by its terms, *focuses on whether a motor vehicle was involved.*

Furthermore, the majority's conclusion is dubious; its implication is that a pedestrian injured as a result of a traffic violation committed by the operator of a motor vehicle would not have a claim, while an operator of a motor vehicle injured as a result of a traffic violation committed by a pedestrian would have a claim under the Act. As we have noted on many prior occasions, the General Assembly could not have reasonably intended such an illogical distinction. *See Ross v. State Bd. of Elections,* 387 Md. 649, 667, 876 A.2d 692, 702 (2005) (rejecting statutory construction advocated by the State Board of Elections because it was " 'unreasonable, illogical, unjust, [and] inconsistent with common sense' ") (alteration in original); *In re Colby H.,* 362 Md. 702, 722, 766 A.2d 639, 649–50 (2001) (" '[C]onstruction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided.' "); *Comptroller of Treasury v. Gannett Co., Inc.,* 356 Md. 699, 716, 741 A.2d 1130, 1139 (1999) (stating that this Court should not attribute such an illogical intent to the General Assembly).

Also, the majority's decision runs afoul of our interpretation of the phrase "involving a motor vehicle." In *Nasseri v. GEICO General Insurance Co.*, 390 Md. 188, 888 A.2d 284 (2005), we addressed a coverage issue under the Motor Vehicle Insurance subtitle of the Insurance Article. GEICO, the insurance company, argued that the driver of a taxicab, involved in an accident with a motor vehicle, was not entitled to personal injury protection coverage because the accident did not fall within the meaning of "motor vehicle accident," which was defined as "an occurrence *involving a motor vehicle* that results in damage to property or injury to a person." Maryland Code (1997, 2002 Repl.Vol., 2005 Supp.), Section 19–501(c)(1) of the Insurance Article (emphasis added). Specifically, the insurance company argued that the accident was not a "motor vehicle accident" because a taxicab is not considered a "motor vehicle" under the statute. We rejected this argument, however, noting that the phrase "involving a motor vehicle" required only that one of the vehicles involved in the accident was a motor vehicle:

> A principal flaw in GEICO's argument is that § 19–501(c)(1) of the Insurance Article does *not* define "motor vehicle accident" as an "accident which does not involve a taxicab." Instead, the statute defines "motor vehicle accident" as "an occurrence involving a *motor vehicle* that results in damage to property or injury to a person." The occurrence in the present case clearly involved "a motor vehicle," namely the other vehicle with which Nasseri's taxicab collided.

*Nasseri*, 390 Md. at 193, 888 A.2d at 287 (emphasis in original). Within three years, this Court deviates from this holding, without discussion. In so doing, the majority errs.

By reversing the decision of the Criminal Injuries Compensation Board, the majority gives no deference to the interpretation of law offered by the agency charged with interpreting the Criminal Injuries Compensation Act and, thus, fails to apply the appropriate standard when reviewing an administrative agency adjudicatory decision, thereby confusing our jurisprudence, which we recently correctly explicated in *Maryland*

*Aviation Admin. v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005):

> A court's role in reviewing an administrative agency adjudicatory decision is narrow; it is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.
>
> In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. A reviewing court must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence.
>
> Despite some unfortunate language that has crept into a few of our opinions, a court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency. Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected.
>
> \* \* \*
>
> If there is a need to articulate a standard for judicial review of an agency's legal rulings, it is sufficient to say that a reviewing court must determine if the administrative decision is premised upon an erroneous conclusion of law.

*Id.* at 571–72, 574 n. 3, 873 A.2d at 1154–55, 1156 n. 3 (citations omitted) (internal quotation marks omitted).

The majority supports its deviation in interpretation from that of the Criminal Injuries Compensation Board by concluding that the Board's analysis is not part of a "long-standing or consistent practice by the Criminal Injuries Compensation Board to which particular deference would be due," Op. at 604 n. 8, 943 A.2d 1229 n.8, which now this Court identifies as a noteworthy limitation on agency interpretation; by so doing, this Court has substituted its judgment for the Board, even though, as pointed out in *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 68–69, 729 A.2d 376, 381 (1999), "[d]espite some unfortunate language that has crept into a few of our opinions, a 'court's task on review is *not* to "substitute its judgment for the expertise of those persons who constitute the administrative agency," ' " because "[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency." In *Noland*, we further pointed out that such "substituted judgment" language is disapproved:

> The "substituted judgment" language is misleading and inaccurate for several reasons. *It suggests, with respect to legal issues, that no deference whatsoever is owed to the agency's decision. That is not the law.* In an action for judicial review of an administrative agency's decision, the "court must review the agency's decision in the light most favorable to it," and "the agency's decision is prima facie correct and presumed valid." In addition, the agency's interpretations and applications of statutory or regulatory provisions "which the agency administers should ordinarily be given considerable weight by reviewing courts." *"Furthermore, the expertise of the agency in its own field should be respected."*

386 Md. at 573 n. 3, 873 A.2d at 1155 n. 3 (emphasis added) (citations omitted). The majority's assertion, then, that this is not a situation in which "particular deference would be due" does not accord with our jurisprudence. Affording the Criminal Injuries Compensation Board deference in its definition of "crime" and adhering to our standard of review for clear error

of law would require the opposite result than that of the majority.

I respectfully dissent.

Judges GREEN and CATHELL authorize me to state that they join in this dissenting opinion.