*Victoria Falls Committee for Truth in Taxation, LLC v. Prince George's County*, No. 59, September Term, 2013

**Taxation – Special Taxing Districts – Statutory Interpretation –** Court of Appeals held that that the Legislature did not intend, by the plain meaning of Maryland Code (1957, 2011 Repl. Vol.), Art. 24, § 9-1301(h)(3)(ii), to obligate Prince George's County to determine, before final action, whether changes in land ownership within the relevant "geographic region" constituting a proposed special taxing district may have affected the required super-majority of landowners volunteering for the special taxes as existed at the time of the initial request, in accordance with subsection § 9-1301(d)(1). Furthermore, the Court held that the County's approval of the request to create a special taxing district, which excluded 25 of 609 lots within a planned community, was lawful under the requirement in subsection § 9-1301(c)(2) that a special taxing district be used to finance infrastructure improvements in "any defined geographic region within the county."

Circuit Court for Prince George's County
Case No. CAL 11-12645
Argued: February 11, 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 59

September Term, 2013

———————————————————

VICTORIA FALLS COMMITTEE FOR
TRUTH IN TAXATION, LLC, ET AL.

v.

PRINCE GEORGE'S COUNTY,
MARYLAND

———————————————————

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

———————————————————

Opinion by Harrell, J.

———————————————————

Filed: March 21, 2014

We consider here a challenge by Petitioners, the Victoria Falls Committee for Truth in Taxation, LLC (the "Taxpayers"), to a resolution enacted by the Respondent, Prince George's County, Maryland (the "County"), creating the Victoria Falls Special Taxing District (the "Special Taxing District" or the "District"), under authority granted by a State enabling act (the "Act"), Maryland Code (1957, 2011 Repl. Vol.), Art. 24, § 9-1301. We hold that the State Legislature did not intend, by the plain language of subsection § 9-1301(h)(3)(ii), to require that the County determine whether any change in land ownership (occurring after the time of application for creation of the District, but before final action on the application) may have affected the super-majority landowner(s) requirement, expressed in subsection § 9-1301(d)(1) of the Act, for applying for the District. Furthermore, we hold that the County's approval of the request to create a Special Taxing District that did not include 25 of the 609 lots within the planned Victoria Falls community, was lawful under the Act's requirement that the District be used to finance infrastructure improvements in "any defined geographic region within the county." Accordingly, we affirm the judgments of the Maryland Tax Court, the Circuit Court for Prince George's County, and the Court of Special Appeals on both grounds.

## FACTS

On 10 March 2005, five applicants filed jointly a written request (the "Request"), with then Prince George's County Executive Jack B. Johnson and the Prince George's County Council (the "Council"), to create and recognize a voluntary special taxing district for Central Parke at Victoria Falls ("Victoria Falls"), a planned retirement community in Laurel, Maryland. The five applicants were the developer of the

community and the four entities under contract to buy the lots and construct the dwellings for sale in the community (collectively, the "Applicants"). The developer was The Pines of Laurel, LLC (the "Developer"), and the four home builders were Michael Harris Development, LLC, Sturbridge Victoria Falls, LLC, V Falls, LLC, and the Drees Company (collectively, the "Builders").

At the time the Applicants filed the Request, the Victoria Falls community was already under construction. Of the 609 residential units planned to be in Victoria Falls, twenty-five dwellings and their lots, which were scattered throughout the community, were sold by the Applicants before the filing of the Request. Those twenty-five units (and the lots on which they were situated) were not included within the confines of the proposed District. As a result, the plat submitted with the Request describes the geographic region as excluding graphically the twenty-five units that were sold already, some of which shared property lines or common walls with one or more of the 584 units within the proposed District. Consequently, the owners of those twenty-five units or lots were not among the Applicants. The five Applicants owned 100 percent of the property constituting the proposed District when they filed with the County the Request for its creation.[1]

The purpose for seeking creation of the Special Taxing District was to transfer (or seek reimbursement of) the cost of public infrastructure improvements within Victoria

---

[1] See *infra* at 13 where we relate the pertinent statutory requirement that at least two-thirds of the owners of the real property within the proposed District must concur in the request.

Falls from the Applicants to the parties purchasing the dwelling units to be constructed. Approximately seventy-five percent of the public infrastructure had been completed by the Developer prior to the filing of the Request. The Applicants requested the issuance and sale by the County of special obligation bonds in an aggregate principal amount of up to $12 million, to be repaid by the ultimate owners of property within the proposed District, through payment of the Special Taxes, over a 30-year term. Although it appears that all 609 units within Victoria Falls would benefit from the infrastructure improvements, only the 584 units within the proposed District would be assessed a special tax to repay the bonds. The owners of the twenty-five excluded properties would be responsible otherwise, however, for paying deferred water and sewer charges.

The County Executive reviewed the Request before its consideration by the Council. The Applicants supplemented the Request with an Economic Benefit Analysis, which estimated that tax revenues assessed and collected by the County on the Victoria Falls community and its residents would result in a cumulative revenue surplus for the County of approximately $88.5 million, after deducting the estimated County expenditures for on-going governmental services to the community and its expected residents. The Developer and the County Executive executed a Letter of Intent identifying $9,465,098 in routine public infrastructure improvements and budgeted costs associated with the District. Prior to filing the Request and executing the Letter of Intent, the Developer had posted a bond or bonds to cover the cost of all of the public infrastructure improvements, as a condition for recordation of the approved final subdivision plat, without which the development could not have begun.

-3-

When the Request reached the Council, the Applicants explained that their initial bank loan was near its maximum loan limit and they were requesting the special obligation bonds to prevent the delay and reduction of the scope of certain amenities and landscaping within the District, as well as remaining offsite work and other improvements. Moreover, a report supplied on the Applicants' behalf to the County noted that the cumulative amount of the Special Taxes on each property would not exceed the value of the benefit to the property resulting from the infrastructure improvements, and that the Special Taxes were allocated such that each parcel within the District would be taxed proportionally to the likely benefit it would receive. The County Executive noted that the financing of the improvements under the proposed District would "ensure the development of a first-rate age restricted residential community." As a further supplement to the Request, a document, entitled Bond Financing Projection No. 14, was supplied, which projected how the proceeds of any bonds issued subsequently by the County would be used and financed by the taxpayers within the District.

On 23 June 2005, the County Executive recommended to the Council the creation of the District. The Council introduced the County Executive's proposal as "CR-49-2005- A Resolution Concerning Victoria Falls Special Taxing District" (the "Resolution"). The Resolution was referred to the Council's Public Safety and Fiscal Management Committee (the "PSFM Committee"). The PSFM Committee recommended favorably to the full Council, on 13 July 2005, the proposed Resolution. On 14 July 2005, the Council published, in four local newspapers, identically-worded notices of a 26 July 2005 public hearing before the Council regarding the Resolution. At

-4-

the hearing on 26 July 2005, none of the Taxpayers, or any other persons, spoke in opposition to the creation of the District. The Council adopted the Resolution. On 29 July 2005, the County Executive approved the Resolution, and it became effective on that date. The Resolution authorized special obligation bonds in an aggregate principal amount not to exceed $12 million for the financing of (and the reimbursement of expended costs for) the infrastructure improvements in the Victoria Falls community, and levied a special tax on the property owners within the District.

The Resolution created also rates and methods for the apportionment of the Special Taxes. It addressed initial tax rates for the different property types within the District for the 2005-2006 tax year,[2] mandated two-percent rate increases on a yearly basis, provided for a back-up tax on undeveloped properties if developed properties did not produce sufficient tax revenues, and provided for the termination of the Special Taxes in the District on 30 June 2035, unless the bonds were repaid fully prior to that date.

---

[2] The Developer designed the Victoria Falls community to contain four different types of homes, and the 584 units in the District included homes of each type. The initial maximum tax rates and estimated cumulative tax through the 2034-2035 tax year for each property owner, as assessed by type, are as follows:

| Type of Residence | Initial Tax Rate | Estimated Cumulative Tax |
|---|---|---|
| Condominium | $1,161.00 | $40,366.60 |
| 28' Single-Family Attached | $1,373.00 | $47,733.06 |
| 32' Single-Family Attached | $1,446.00 | $50,275.68 |
| Single-Family Detached | $1,563.00 | $54,344.00 |

Following the enactment of the Resolution, the County issued special obligation bonds, in the fall of 2005, in the principal amount of $12 million, and collection of the Special Taxes commenced to retire the bonds.

The Applicants continued to market homes in Victoria Falls between the filing of the Request on 10 March 2005 and the effective date of the Resolution on 29 July 2005. Specifically, they entered into fifty-nine contracts with certain of the Taxpayers for the sale of property included within the District, some of which went to closing before, and some after, the Resolution became effective on 29 July 2005. Thirty-nine purchasers closed prior to the Council's adoption of the Resolution on 25 July 2005,[3] at which time forty-four property owners existed in the proposed District—the thirty-nine above-mentioned purchasers and the five Applicants. Some of the Taxpayers who became ultimately legal owners of property within the District after its creation had binding sales contracts in place before the Applicants filed the Request with the County.

During the time period between the filing of the Request and the enactment of the Resolution, the County was aware of the ongoing marketing and sales activities by the Applicants of properties within the proposed District. To address concerns raised by members of the PSFM Committee concerning notice of the implications of the proposed Special Taxing District to current and future property owners in the District, the Developer submitted a Memorandum to the Council, dated 10 June 2005, describing the

---

[3] Of the thirty-nine purchasers who closed on the sale of property within the District prior to adoption of the Resolution, twenty-nine are within the group of Taxpayers challenging the Special Taxing District, and ten are not parties to the present case.

Developer's policies for notifying purchasers of property within the District. Purchasers of property within the District all received at least one form of disclosure of the Special Taxes, with some purchasers receiving as many as nine separate disclosures. The number and type of disclosures received varied according to the time period in which particular purchases transpired. The disclosures of relevance in the present case are those provided to the thirty-nine purchasers who became new legal title owners of property before the County adopted the Resolution creating the Special Taxing District. Those disclosures were presented to each of the thirty-nine purchasers in a document titled "Addendum to New Home Sales Contract" ("Addendum"), which the sales agents included in the closing documents of each sale. Each of the thirty-nine purchasers executed an Addendum, in the process of closing on the purchase of their property, prior to the creation of the District. The form of each Addendum read, in pertinent part:

> The Development is proposed to be located within the Victoria Falls Special Assessment District (the "Special Assessment District"), a special taxing district which may be created by Prince George's County. If the development becomes subject to the Special Assessment District taxing scheme, each owner of a lot or home in the Development will be liable to pay annually any special assessment and/or special tax imposed under Chapter 10-269 of the Prince George's County Code (the "Special Assessment District Assessment").[4] As of the date of these disclosures, the rates or amounts of the Special Assessment District Assessment have not yet been set by the County, but, if the Special Assessment District is established, the amount assessed will be set at a fixed rate each year, resulting in an estimated Special Assessment District Assessment for the initial year (commencing in fiscal year 2005) to be approximately

---

[4] Chapter 10-269 of the Prince George's County Code is, for present purposes, identical to Article 24, § 9-1301, of the Maryland Code. The parties agreed, and we concur, that, to simplify the decision in this case, we need refer only to the State's statute in the remainder of our opinion.

$1,300.00 to $1,600.00 for a single family detached house; however, such amounts are estimates only and are subject to change. Homebuyer shall be liable to pay the full amount of the Special Assessment District Assessment actually assessed from time to time against the property. The Prince George's County Council may increase the rate of any special tax or principal of, interest on and any redemption premium on any bonds which are to be issued by the County for the Special Assessment District and to replenish the debt service reserve fund for such bonds. The Special Assessment District Assessment would commence in the amount specified above with respect to all lots on a specified date after the bonds are sold by the County for the Special Assessment District (the "Commencement Date"). The Special Assessment District Assessment would terminate (except as to any unpaid Special Assessment District Assessments, interest, costs, late fees, and/or attorneys' fees) on the date that the bonds have been paid in full. For further information on the Special Assessment District Assessment, a purchaser of a Lot may contact Mr. Thomas L. Kozeny at 703-426-9532.[5]

Shortly after commencement of collection of the Special Taxes, a group of Taxpayers formed an umbrella organization, the Victoria Falls Committee for Truth in Taxation, LLC.

## PROCEDURAL BACKGROUND

In April 2008, 272 Taxpayers (no Applicant was a part of this group) within the Special Taxing District filed suit in the Circuit Court for Prince George's County, in the name of their umbrella organization, alleging that the County was taxing them illegally, and seeking declaratory and injunctive relief and a refund of taxes paid. The County removed the case to the United States District Court for the District of Maryland, sitting in Greenbelt, Maryland. That court remanded the case to the Circuit Court, after which

---

[5] The record reveals no calls to Mr. Kozeny, an employee of the County, about the proposal to create the District.

the homeowners acquiesced in the County's demand that they proceed via tax refund applications, rather than the pending lawsuit. Thus, the original action in the Circuit Court was dismissed.

On 31 December 2008, 279 Taxpayers within the District filed a tax refund application with the County. The County denied the application on 2 June 2009. The Taxpayers filed timely a Petition of Appeal with the Maryland Tax Court on 15 September 2009. On 22 April 2010, 46 additional Taxpayers, whose refund claims the County denied also, filed a second Petition of Appeal. The Tax Court consolidated the two Petitions.

On 27 January 2011, following the filing of briefs and a stipulated record, the Tax Court heard oral argument from the parties. The Tax Court issued a Memorandum and Order denying Taxpayers' claims on 11 May 2011. The Taxpayers filed timely a Petition for Judicial Review in the Circuit Court for Prince George's County. Following briefing and argument on 9 November 2011, the hearing judge issued a Memorandum Opinion, on 1 March 2012, affirming the decision of the Tax Court.

The Taxpayers filed timely an appeal of the Circuit Court's judgment to the Court of Special Appeals. On 27 March 2013, the intermediate appellate court, in an unreported opinion, affirmed the judgment of the Circuit Court. The Taxpayers filed timely a Petition for Writ of Certiorari in this Court, which we granted on 3 July 2013,

*Victoria Falls Comm. for Truth in Taxation v. Prince George's Cnty.*, 432 Md. 467, 69

A.3d 474 (2013), to consider the following questions, which we rephrase somewhat:[6]

1. Did the Maryland Tax Court uphold properly the County's Resolution creating a Special Taxing District, where changes in land ownership within the District occurred after the filing of the voluntary Request to be taxed, by a "super-majority" of the landowners under Md. Code, Art. 24, § 9-1301(d)(1), and before the County's subsequent approval?

2. Did the Maryland Tax Court rule properly that the County's approval of a voluntary Special Taxing District excluding 25 of the 609 properties in a planned development is lawful, in light of the condition that the Special Taxing District must fund infrastructure improvements for "any defined geographic region within the county," under Md. Code, Art. 24, § 9-1301(c)(2)(i)?

## STANDARD OF REVIEW

"Despite its name, the Maryland Tax Court actually is an administrative agency of

the State." *F.D.R. Srour P'ship v. Montgomery Cnty.*, 407 Md. 233, 243, 964 A.2d 650,

656 (2009) (citing Md. Code (1988, 2004 Repl. Vol.), Tax-General Art., § 3-102). We

---

[6] The questions presented in the Petition for Writ of Certiorari read:

1. When a request is made to a county to create a voluntary Special Taxing District (STD) under MD Code Ann., Art. 24 § 9-1301(d)(1), by the requisite super-majority of property owners, and subsequent property ownership changes reduce the voluntary super-majority to a minority before the request is acted upon by the county, may the county nevertheless approve the STD on the basis of the original request?

2. When a request is made to a county to create a voluntary Special Taxing District (STD) under MD Code Ann., Art. 24 § 9-1301(d)(1), by the requisite super-majority of property owners, and subsequent property ownership changes reduce the voluntary super-majority to a minority before the request is acted upon by the county, may the county nevertheless approve the STD on the basis of the original request?

-10-

review the agency's decisions directly, notwithstanding the reviews by any intervening courts. *Id.* The parties stipulated to all of the pertinent facts in the present case, thus our review is limited to whether the Tax Court applied correctly the pertinent law to the facts. Because the statute at issue is not one the Tax Court administers regularly, or for which the Tax Court has a pertinent long-standing interpretation, we do not afford the degree of deference courts generally afford to an agency's construction of such a statute. *Opert v. Criminal Injuries Comp. Bd.*, 403 Md. 587, 604 n.8, 943 A.2d 1229, 1239 n.8 (2008) ("[W]e discern no long-standing or consistent practice by the [agency] to which particular deference would be due."). Therefore, we review the Tax Court's construction of the Act without deference to the agency's interpretation.

## PERTINENT PRINCIPLES OF STATUTORY CONSTRUCTION

We explained previously the principles of statutory construction we apply to our review of the statutory language at issue:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.

> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Mummert v. Alizadeh*, 435 Md. 207, 213-14, 77 A.3d 1049, 1052-53 (2013) (quoting

*Lockshin v. Semsker*, 412 Md. 257, 274-76, 987 A.2d 18, 28-29 (2010)).

## DISCUSSION

## I.

Our analysis begins with a brief explication of the State enabling act, enacted by the General Assembly in 1995 to provide certain counties with the authority to create special taxing districts. The Act was codified at § 9-1301 of Article 24 of the Maryland Code.[7] The Act is virtually identical to prior enabling legislation, enacted in 1990, that

---

[7] The Act was repealed and re-enacted in 2013, as part of Maryland's ongoing Code revision effort, within Title 21, Subtitle 5, of the Local Government Article of the

(continued…)

-12-

gave similar authority to municipalities. Subsection (c)(1) of the Act specifies that counties have the authority to "(i) Create a special taxing district; (ii) Levy ad valorem or special taxes; and, (iii) Issue bonds and other obligations." The next subsection of the Act explains the purpose of those enumerated authorities:

> The purpose of the authority granted under paragraph (1) of this subsection is to provide financing, refinancing, or reimbursement for the cost of the design, construction, establishment, extension, alteration, or acquisition of adequate . . . infrastructure improvements . . . , whether situated within the special taxing district or outside the special taxing district if the infrastructure improvement is reasonably related to other infrastructure improvements within the special taxing district, for the development and utilization of the land, each with respect to any defined geographic region within the county.

Art. 24, § 9-1301(c)(2). A county's authority to issue bonds for a special taxing district must arise, however, from a voluntary request by at least a two-thirds super-majority of the owners of the land to be taxed:

> . . . the county may borrow money by issuing and selling bonds for the purpose stated in subsection (c)(2) of this section if a request to the county is made by both:
>
> (i) The owners of at least two-thirds of the assessed valuation of the real property located within the special taxing district; and
> (ii) At least two-thirds of the owners of the real property located within the special taxing district, provided that:
>
> 1. Multiple owners of a single parcel are treated as a single owner; and
> 2. A single owner of multiple parcels is treated as one owner.

(…continued)

Maryland Code. *See* 2013 Md. Laws 1743-75 (Ch. 119). For present purposes, we will continue to refer to the Act as it was codified in Article 24 at the time of the circumstances giving rise to this suit and its consideration by the intervening courts.

Art. 24, § 9-1301(d)(1). Any resolution adopted by a county authorizing the issuance of bonds for a special taxing district "shall be subject to the request of the landowners as specified under subsection (d)(1) of this section." Art. 24, § 9-1301(h)(3)(ii). Furthermore, before a county may adopt a resolution creating a special taxing district, "the county governing body shall hold a public hearing after giving not less than 10-days' notice in a newspaper of general circulation in the county." Art. 24, § 9-1301(n).

## II.

We will consider the two primary arguments raised by the Taxpayers, and the respective counter-arguments of the County, in turn.

## A.

Taxpayers argue first that the Resolution lacked the requisite voluntariness under the Act because a super-majority of property owners within the land area requesting the creation of the District (as articulated in § 9-1301(d)(1)) did not exist when the County created the District, notwithstanding that the Request, when filed, satisfied the statutory requirement at that point in time. The County argues, in response, that the super-majority ownership requirement under the Act need be met only when the application to create a special taxing district is submitted, and that the Act does not require that the super-majority be maintained until the time of enactment of a resolution.

Each of the parties contends that its argument is correct, based on the plain language of subsection (h)(3)(ii), when considered in light of the Act as a whole and its purpose. The parties interpret differently, however, the language in subsection (h)(3)(ii) requiring that a resolution, such as the one enacted by the County here, authorizing the

-14-

creation of a special taxing district and the issuance of bonds to finance, refinance, or reimburse the cost public infrastructure improvements, "shall be subject to the request of the landowners as specified under subsection (d)(1) of this section," referring to subsection (d)(1)'s super-majority requirements at the time of the initial voluntary request to the County.

The Taxpayers argue that the pertinent language of (h)(3)(ii) requires that the super-majority of petitioning landowners must still exist at the time of a resolution's enactment, not merely when a district is requested to be created. Taxpayers base their argument, in sum, on the possibility that the parameters of a requested special taxing district could change (due to government action, withdrawals by requestors, or private contracts) between the submission of the request by the petitioning landowners and ultimate action (i.e., resolution, ordinance, or denial of the request) by the County. In particular, the Taxpayers attack the conclusion of the Court of Special Appeals that the statutory language "shall be subject to the request of landowners" in 9-1301(h)(3)(ii) means merely "controlled by the request." The intermediate appellate court's reasoning is flawed and weakens the statutory authority of the County, the Taxpayers contend, because the Act obliges the County to make certain determinations about the ultimate resolution,[8] and thus the County should not be "straight-jacketed" by the initial request of the parties to be taxed.

---

[8] As the Taxpayers point out, the County determines ultimately, under the Act, the boundaries of a voluntary special taxing district, the infrastructure to be financed, and the amount of infrastructure funding to be raised by the issuance and selling of bonds.

-15-

Taxpayers seek to fortify their position regarding their version of the plain meaning of § 9-1301(h)(3)(ii) with two additional arguments. First, they argue that their interpretation of the Act's language is consistent with the concept of petitioner withdrawal. Second, Taxpayers assert that the disclosures signed by those Taxpayers who became legal title owners of property within the District before the County adopted the Resolution are irrelevant in our analysis of the meaning of § 9-1301(h)(3)(ii).

The County counter-punches that the Court of Special Appeals, the Circuit Court, and the Tax Court concluded correctly that the Act's super-majority requirement was satisfied at the time the Applicants filed the Request. The County contends that the plain language of the Act does not include requirements that the County obtain consent from post-request purchasers within the proposed District or that the requesting parties must maintain a minimum two-thirds majority ownership of the proposed District throughout the review and approval process of the Resolution. Additionally, the County argues that the Taxpayers are precluded, under the doctrines of waiver and estoppel, from challenging the validity of the Resolution here because they failed to object to it prior to its enactment by the County.

We agree with the County's interpretation of § 9-1301(h)(3)(ii).[9] In light of the plain language of the Act, within the context of the statutory scheme as a whole, we

---

[9] Because we agree with the County as to this statutory interpretation issue, we need not address head-on the County's waiver and estoppel arguments; however, we shall give glancing blow consideration of the factual aspects of these arguments later in our analysis.

conclude that the Court of Special Appeals interpreted correctly the language "shall be subject to the request of the landowners as specified under subsection (d)(1)" to mean "controlled by the request" of the landowners. The plain language of the Act does not require, as the Taxpayers assert, that a change in land ownership occurring between the application for, and subsequent enactment of, a special taxing district affects inevitably the County's ability to create it.

Had the possibility of a change in ownership affecting the threshold super-majority requirement been important to the statutory scheme, the General Assembly could have provided, for example, for a certification to the County that changes in ownership sufficient to fall below the two-thirds majority requirements of § 9-1301(d)(1) have not occurred, or, in the event that such a change in ownership did occur (as was the case here), some process could have been provided to determine whether the new landowners agreed to be co-applicants for the proposed District. The Act, however, is devoid of any such requirement or expectation. To adopt the Taxpayers' interpretation of the plain language of the Act would be to read the Legislature's choice of the word "request" as including "approval" as well, or to read additional requirements into the Act. To do so, however, would violate a cardinal rule of statutory construction. *See, e.g.*, *Leppo v. State Highway Admin.*, 330 Md. 416, 423, 624 A.2d 539, 542 (1993) ("This

-17-

Court may not judicially place in the statute language which is not there in order to avoid a harsh result.") (internal quotation marks and citations omitted).[10]

In our view, the plain language of the Act reflects that the General Assembly included the pertinent language in (h)(3)(ii) as a check on the County's authority to make the final determinations regarding the particulars of a special taxing district. The Taxpayers' view, that the County would be "straight-jacketed" or deprived of legal authority if we adopted the Court of Special Appeals's conclusion that "subject to the request" means "controlled by the request," is too narrow. Although other sections of the Act give the County authority to make final determinations, the language "shall be subject to the request of the landowners" in (h)(3)(ii) makes clear that the County does not have *carte blanche* to create a special taxing district of its own liking and design. In other words, although the County has some leeway, under the Act, in implementing the initial request for a special taxing district (made voluntarily by a super-majority of the landowners to be taxed), including rejecting the request, the County would violate the law if it created a special taxing district that deviated significantly and materially from the initial request. That is not the case here. Our review of the record indicates that the District created by the County conformed to the terms and description in the Request for voluntary taxation.

---

[10] This is not to say that it would not have been prudent to include such mechanisms to ensure that no material change in voluntariness had occurred. The role of the Judiciary does not include blue-lining legislation to make it "better."

The gist of the Taxpayers' argument, however, is not that the County deviated from the terms of the initial voluntary Request, but that the changes in land ownership between the filing of the Request and the passing of the Resolution rendered the District involuntary by the time of enactment. This argument suffers from two defects. First, the Act's language contains no indication that a request for a special taxing district, voluntary at the time of filing with the County, becomes involuntary automatically due to a change in land ownership thereafter. According to the plain language of the Act, the process leading to the creation of a special taxing district requires three basic steps: (1) a voluntary request for taxation by a super-majority of landowners in the proposed district; (2) a review of the proposal by the County, which includes a public hearing; and, (3) the enactment of an ordinance or resolution by the County establishing the district. Those steps were satisfied in this case. As explained above, nowhere in the Act did the General Assembly include language creating a process for reviewing the status of land ownership post-request, i.e., closer to, or at the time of, the enactment of an ordinance or resolution.

Second, this record contains no evidence indicating that any landowner (legal or equitable) in the area proposed to be taxed notified the County, prior to the enactment of the Resolution, that he or she objected to the taxation that would result from the creation of the District. The Taxpayers fault the County for not seeking to determine whether the voluntariness of the request for the District changed, knowing that the Applicants were marketing and selling actively properties within the confines of the proposed District. The record indicates, however, that it was the County's concern over the willingness of the subsequent homebuyers to participate in the Special Taxing District that precipitated

-19-

apparently the disclosures to all of the Taxpayers. For example, a briefing presentation on the Request, created by the County Office of Audits and Investigations, states that "[i]n considering the proposed legislation, the County Council focused on the need to ensure that adequate disclosure of the special tax be given to initial and subsequent property owners," and outlined the various disclosures provided subsequently by the developer.[11]

Additionally, we are not persuaded by the Taxpayers' argument that we should adopt their interpretation of the plain language of § 9-1301(h)(3)(ii) on the ground that their version is consistent with the concept of petitioner withdrawal. The Taxpayers rely on a statement in 64 C.J.S. *Municipal Corporations* § 976 (2009), concerning the withdrawal of Taxpayers, as well as an American Law Reports entry regarding the timing of withdrawals generally, M.L. Cross, Annotation, *Right of Signer of Petition or Remonstrance to Withdraw Therefrom or Revoke Withdrawal, and Time Therefor*, 27 A.L.R.2d 604 (1953). Those authorities and the cases cited therein make clear that withdrawal may be appropriate *before* final government action on a petition. *See, e.g.*, 64 CJS *Municipal Corps.* § 976 ("[I]t has been held that the signers are free to withdraw their names up to the time when the municipal corporation has acted"); *Dagley v. McIndoe*, 176 S.W. 243 (Mo. Ct. App. 1915) (holding that a signer may have his signature stricken or withdrawn before the petition is acted on by the governmental agency). On this record, there is no evidence that any landowners within the proposed

---

[11] Although the presentation occurred in 2008, nearly three years after the County created the District, it refers to events leading up to creation of the District.

District notified the County of an intent to withdraw from the Request to create the District. Furthermore, none of the authorities on which the Taxpayers rely suggest that a County has a duty to survey proactively the signers of a petition or request, or persons to whom those petitioners/requestors sold land within a proposed special taxing district, to determine whether they have an intent to withdraw from the petition or request. To the extent that the concept of petitioner withdrawal is consistent with the Taxpayers' reading of the Act, it is not applicable in this case.

We disagree with the Taxpayers' argument that the disclosures, particularly the Addenda to the contracts of those Taxpayers who agreed to purchase property in the time period after the filing of the Request for the District and before passage of the Resolution, are irrelevant. The Taxpayers contend that if those purchasers could not affect the required two-thirds super-majority of landowners after the Request was filed, then the fact that they were given notice of the District's potential creation after the Request is meaningless. The disclosures are relevant because they contradict the notion that the County knew, or should have known, as the Taxpayers allege, that there was no longer a requisite super-majority of landowners in the District agreeing voluntarily to be subject to the special tax. The Taxpayers point out that the County did not receive notice from any of the new landowners consenting to the special tax, but, as the record reveals, nor did the County receive any notice of protest or withdrawal from any of the new legal or equitable landowners. The Addendum disclosures included the phone number of a County employee, whom the new landowners could call if they had questions about, or problems with, the proposed Special Taxing District, but no communications with that employee

-21-

are in this record. It appears that the County's purpose in mandating disclosures to the new landowners was, in part, to maintain that the voluntary submission to the proposed District remained. No evidence in this record demonstrates that the County should have assumed otherwise.

The Taxpayers complain also that they were not provided with advance individual notice by the County of the public hearing to take place on 26 July 2005, but they point to no authority to support the proposition that individual notices were necessary. The Act states clearly that notice of the public hearing must be published "in a newspaper of general circulation in the county" at least ten days before the hearing. § 9-1301(n). The County published identically-worded notices of the hearing in four different newspapers of general circulation in the County on 14 July 2005, twelve days before the hearing. The Taxpayers concede that none of them attended the hearing to voice to the Council any objection to the creation of the District. We do not know, on this record, whether the Taxpayers did not read the newspaper notices, or read them but chose simply not to attend the public hearing. In either event, the lack of attendance or protest by any Taxpayers at the public hearing cannot be attributed to any inadvertence or fault on the part of the County.

The Taxpayers seem to interpret the ruling that the super-majority requirement must be found to have been satisfied, under the Act, only at the time of the filing of the Request, to mean that the parties who purchased property within the proposed District prior to the passing of the Resolution were powerless to prevent its creation. We do not need to subscribe to or reject here that interpretation. Those parties signed an Addendum

that disclosed the potential for the coming into existence of the District and through which they agreed to "be liable to pay the full amount . . . actually assessed against the property" under the District. By signing that Addendum, those purchasers are charged with understanding its terms. *Dashiell v. Meeks*, 396 Md. 149, 167, 913 A.2d 10, 20 (2006). On this record, we do not know what might have happened if one or more of those Taxpayers called the County employee mentioned in the Addendum to object to the District's creation, or attended the public hearing to voice opposition to or displeasure with the proposed District. We cannot assume that the County would have ignored their objections and created the District notwithstanding. Therefore, we shall not assume that the Taxpayers lacked the power to prevent the creation of the District.

We hold that, under the plain meaning of § 9-1301(h)(3)(ii), the State Legislature did not intend to require that the County re-determine whether the super-majority condition expressed in subsection § 9-1301(d)(1) of the Act was satisfied at the time of the approval of the Resolution creating the Special Taxing District.

**B.**

The Taxpayers' second argument, that the Special Taxing District, as designed, violates the statutory requirement of a "defined geographic region within the county" under § 9-1301(c)(2), is unavailing as well. They contend that by excluding twenty-five lots—which the Applicants conveyed prior to filing the Request to create the District and are located throughout non-contiguous parts of the planned community, but are contiguous with properties within the District—the developers crafted, and the County created, an arbitrary "checkerboard" District not constituting a "defined geographic

-23-

region." The Applicants' intent in designing such a "gerrymandered" District, the Taxpayers continue, was for the purpose of excluding properties whose owners would not have consented likely to a special tax and, thus, facilitated the Applicants satisfying the super-majority condition discussed above. To hold that such a District is legitimate under the Act simply because it is a defined area, the Taxpayers argue, would result in reading the "geographic region" language out of the Act.

The County urges us to affirm the determination of the Tax Court, with which the Circuit Court and Court of Special Appeals agreed, that the Special Taxing District defined by the County's Resolution does not violate the express terms of § 9-1301(c)(2), and defer to the County's legislative determination in accepting the configuration of the District.

We agree with the County. The Act refers to "*any* defined geographic region." § 9-1301(c)(2) (emphasis added). As the Tax Court noted, nowhere in the language of the Act did the General Assembly specify that a special taxing district must "have a particular shape or include particular properties," nor does it contain "any reference to contiguity or a specific subdivision." The Applicants defined clearly the District in the Request, which contained a plat showing the properties to be taxed, and included the block and parcel numbers, as well as the property tax identification numbers, of the properties within its boundaries.

We are not persuaded by the Taxpayers' attempts to distinguish this case from *Leonardo v. Board of County Commissioners*, 214 Md. 287, 134 A.2d 284 (1957), on which the Court of Special Appeals relied in upholding the ruling of the Tax Court. They

-24-

argue that this Court based its holding in *Leonardo*, that a special taxing district excluding certain properties was lawful, on the fact that the properties excluded from the district did not benefit from the infrastructure improvement it was created to finance. Although we did mention in *Leonardo* that the parties did not attempt to prove that the excluded properties benefitted from the improvement, we did so in explaining that it would be illegal to tax the properties if they received no benefit. 214 Md. at 308, 134 A.2d at 294. We did not say in *Leonardo* that a property benefitting from an improvement financed by a special tax must be subject to that tax.

Furthermore, the Taxpayers have not shouldered the formidable burden of showing that the exclusion of such properties in this case constituted the type of "manifestly arbitrary or unreasonable" design that would undermine the otherwise "broad" and "conclusive" discretion provided to a municipality or county in "the establishment of improvement districts." *Leonardo*, 214 Md. at 308-09, 134 A.2d at 294-95; *see also Williams v. Anne Arundel Cnty.*, 334 Md. 109, 123, 638 A.2d 74, 80 (1994) ("'[I]n the absence of a showing of arbitrary action and plain abuse of power,' the legislative body's decision is final.") (quoting *Pumphrey v. Cnty. Comm'rs*, 212 Md. 536, 542, 130 A.2d 297, 300 (1957)).

As we explained previously, judicial review of legislative action by a local government "is an even more limited standard than the already narrow review for arbitrary and capricious action, or for action unsupported by substantial evidence." *Talbot Cnty. v. Miles Point, Prop., LLC*, 415 Md. 372, 393, 2 A.3d 344, 356 (2010). We cannot conclude that the County acted outside of its legal authority where the governing

-25-

Act provides no better or exquisite restriction on the shape, inclusiveness, or contiguousness of a special taxing district than is in the Act presently. The Applicants explained plainly that they were excluding the twenty-five lots sold prior to filing the Request, and gave the County a specific description of which properties would exist within the confines of the proposed District, which the County adopted without changes. Thus, the Tax Court deferred properly to the determination of the County.

Finally, we conclude that the Court of Special Appeals distinguished properly the Taxpayers' reliance on *Schmitt v. Cape George Sewer District No. One*, 809 P.2d 217 (Wash. Ct. App. 1991). As the intermediate appellate court explained, the government agency in *Schmitt* excluded unilaterally certain land from a voluntarily proposed district in order to meet the requirement that owners of fifty-one percent of the land sign a petition. That is not the case here, where the governmental agency enacted without change what was proposed voluntarily in the Request.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.**